STATE OF CONNECTICUT *v.* LORNE J. ACQUIN

SPEZIALE, C. J., PETERS, HEALEY, ARMENTANO and SHEA, Js.

Argued June 3—decision released July 27, 1982

*John R. Williams,* special public defender, for the appellant (defendant).

*Francis M. McDonald,* state's attorney, with whom were *Paul E. Murray,* assistant state's attorney, *Catherine J. Capuano,* special assistant state's attorney, and, on the brief, *Walter H. Scanlon,* chief assistant state's attorney, for the appellee (state).

SPEZIALE, C. J. In the early morning hours of July 22, 1977, police and fire officials found nine bodies, eight of them children, inside the burned-out house of Fred Beaudoin, Sr. and Cheryl Beaudoin in Prospect. All of the victims had been beaten, some had been bound, and Cheryl Beaudoin had been stabbed. The defendant, Lorne Acquin, was indicted for the murders, and charged by information with first degree arson for the burning of the house. After a trial before a jury of twelve, he was found guilty on all counts and sentenced to an effective prison term of not less than 105 years nor more than life.

Before and during trial, the defendant made a number of motions challenging the admissibility of a confession which was obtained from him while he was in police custody on July 22. He also sought to suppress items of physical evidence which he claimed were the fruits of his illegally obtained confession. These motions were denied.[1]

The defendant has appealed to this court, claiming error in (1) the admission of his confession and

---

[1] The court, however, did suppress evidence of the defendant's blood type obtained from a urine sample.

its fruits at trial, (2) the exclusion of a written hearsay statement, and (3) the composition of the jury array.

## I

### THE CONFESSION

The defendant made a confession to the state police in which he described in graphic detail his brutal and apparently motiveless murders of the nine victims. The confession was admitted at trial over the defendant's objection. The defendant claims, inter alia, that the confession was obtained in violation of his fourth amendment right to be free from unreasonable seizures and his fifth amendment right not to be a witness against himself, as those rights are applied to the states through the due process clause of the fourteenth amendment. *Malloy* v. *Hogan,* 378 U.S. 1, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964); *Mapp* v. *Ohio,* 367 U.S. 643, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961).

## A

#### THE FOURTH AMENDMENT CLAIM

A confession is by definition a self-incriminating statement, and any challenge to the admissibility of a confession naturally focuses on the fifth amendment guarantee that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. Const., amend. V. The now familiar warnings required by *Miranda* v. *Arizona,* 384 U.S. 436, 467–73, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), are designed primarily to protect that right. Before the fifth amendment issue is reached, however, a preliminary inquiry involving the fourth amendment must be made.

*Miranda* held that "the prosecution may not use statements . . . stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Id., 444. It is clear in the *Miranda* opinion itself, and also in cases decided by this court, that "[b]efore one suspected of the commission of a crime is entitled to the warnings constitutionally required by *Miranda* . . . two conditions must be satisfied: the suspect must be in the custody of law enforcement officials; *Oregon* v. *Mathiason,* 429 U.S. 492, 495, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977); *Beckwith* v. *United States,* 425 U.S. 341, 344-48, 96 S. Ct. 1612, 48 L. Ed. 2d 1 (1976); and the suspect must be subjected to interrogation. *Rhode Island* v. *Innis,* 446 U.S. 291, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980) . . . ." *State* v. *Stankowski,* 184 Conn. 121, 136, 439 A.2d 918, cert. denied, 454 U.S. 1052, 102 S. Ct. 596, 70 L. Ed. 2d 588 (1981); see *Miranda* v. *Arizona,* supra, 444.

The first prong above is derived from the fourth amendment guarantee of freedom from unreasonable seizures. In this respect, we recently held that "[w]hether the confession and physical evidence are admissible turns on the answers to two subsidiary questions: (1) whether the defendant was 'seized' within the meaning of the fourth amendment to the United States constitution and article first, § 7 of the Connecticut constitution so as to invoke their protection, and, if so, (2) whether he was 'reasonably' seized, that is, whether there was probable cause to seize him. *State* v. *Derrico,* 181 Conn. 151, 157–58, 434 A.2d 356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed. 2d 607 (1980); *Dunaway* v. *New York,* 442 U.S. 200, 99 S. Ct. 2248,

60 L. Ed. 2d 824 (1979)." [2] *State* v. *Ostroski,* 186 Conn. 287, 290–91, 440 A.2d 984 (1982).

## 1

## Custody

The defendant was in the company of police officers for all but a few minutes from 9:30 a.m. on July 22 through the time his confession began at approximately 11:45 p.m. *Ostroski,* supra, requires that the court determine *when* the defendant was legally in custody and whether, at that time, the police had probable cause to arrest him.

At about 9:30 a.m. on the morning of the Prospect fire, police went to Acquin's residence. Trooper James K. Blais told Acquin that the Beaudoin house had burned and some deaths had occurred there. Blais then "asked him if he would voluntarily help us by coming with us to help in the investigation." Acquin voluntarily agreed to go to the Bethany barracks, and then to the Meriden state police headquarters. He was read the *Miranda* rights for the first time at about 10:30 a.m., and officers began to question him about the Beaudoin family and about his own activities on the previous day.[3] The interview was tape recorded.

---

[2] It should be noted that where there is an illegal seizure it is also necessary that the acquisition of the evidence sought to be suppressed be causally related to the illegal seizure. *State* v. *Derrico,* 181 Conn. 151, 157–58, 434 A.2d 356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed. 2d 607 (1980).

[3] Although the *Miranda* rights were read to the defendant and he clearly understood them from his responses, the circumstances surrounding the reading of those rights are particularly unsettling. After Blais read from the card, the following conversation took place:

"Blais: Just want to put your initials on this please.

Acquin: What's all this, . . . ?

Detective Joseph R. Zdanowicz relieved Blais at approximately 10:45 a.m. and also advised Acquin of the *Miranda* rights. Zdanowicz then continued

Blais: Its [sic] just acknowledging that I read those rights to you.

Acquin: . . . court.

Blais: No, no, no, no. I'm not taking this into court. It doesn't say that, I didn't say that to you.

Acquin: (Inaudible).

Blais: No, . . . See we have to tell this. We don't know what you're gonna tell us. See we have to tell, we have to advise you of your Constitutional Rights.

Acquin: (Inaudible).

Blais: Because of the importance . . . , no.

Acquin: (Inaudible).

Blais: Because we're interviewing you. We're just interviewing you. See I won't be talking to anybody . . . advise you of your rights.

Acquin: (Inaudible).

Blais: You've never been advised of your rights before?

Acquin: (Inaudible). . . . arrested.

Blais: You're not arrested."

It is significant that the conversational pattern was repeated later after Detective Joseph R. Zdanowicz read the *Miranda*-based preamble to the defendant's written statement:

"Zdanowicz: Now this is strictly on your own volition.

Acquin: (Inaudible).

Zdanowicz: Alright? Want to read this all over again?

Acquin: (Inaudible).

Zdanowicz: (Inaudible).

Acquin: (Inaudible).

Zdanowicz: They were read to you?

Acquin: (Inaudible).

Zdanowicz: And you don't want to sign it now do you?

Acquin: No because I don't . . . what it says. I don't like what it says.

Zdanowicz: What does it say?

Acquin: It says, (inaudible).

Zdanowicz: No . . . , well are you familiar with the system at all, the judicial system which you must be because you've been there so many times?

Acquin: (Inaudible).

Zdanowicz: You've been there when they've tried to arrange . . . .

Acquin: Yes, . . .

Zdanowicz: Yeah well the courts also . . . talk to people they always . . . have to read people their rights in a situation. That

the questioning and prepared a written statement, which Acquin refused to sign. Shortly thereafter, at about 1:30 p.m., Acquin indicated that he did not want to hear about the details of the crime, and asked to go home. Trooper George R. Hamila escorted Acquin to a police car, and they drove toward Route 69, apparently to take him home to Waterbury.

Upon learning that Acquin was being taken home, Lieutenant James Shay, the officer then in charge of the investigation, radioed an order to Hamila to bring Acquin to the Bethany barracks. Acquin told Hamila that he did not want to go back, and they continued toward Waterbury. When Shay repeated the order, Hamila turned the car around. Acquin protested and opened the door of the moving patrol car to get out. Hamila stopped the car, and Acquin began walking north on Route 69 toward home. Within minutes, at approximately 2 p.m., Shay arrived on the scene, accompanied by four other

---

they could add information or be accused of or whatever the situation may be. So by law we are required to inform a subject of his rights and this is what we're doing. In other words for them, they say they sat here and chatted with you and they warned you of your rights and they gave you this blue card which has all your rights. If you wish to sign it you can but don't if you don't have to. And they do prepare you of your rights because they have to by law. (Inaudible). I'm not giving any . . . statement today, I want you to fully understand what the situation is.

Acquin: I understand."

The statement that a police interviewer "won't be talking to anybody" is in direct contradiction to the statement in *Miranda* that "anything said can and will be used against the individual in court." *Miranda* v. *Arizona*, 384 U.S. 436, 469, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). Because we hold below that the defendant was not in custody during the 9:30 a.m. interview, we need not decide what the legal effect of this elaboration on *Miranda* may be, but we cannot condone any attempt by officers to explain away the import of the fundamental constitutional rights contained in the *Miranda* warnings.

officers in two police cars. Shay placed a hand on Acquin's shoulder and spoke to him briefly. Surrounded by three cars and several officers, Acquin agreed to return to the Prospect command post with Shay.

At oral argument before this court, the state conceded that the defendant was seized for fourth amendment purposes when Shay placed a hand on him on Route 69. We agree.

This court has recently reaffirmed that a person has been "seized" so as to invoke the protection of the fourth amendment " 'only when by means of physical force or a show of authority, his freedom of movement is restrained. . . . As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification. . . . We conclude that a person has been "seized" within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' *United States* v. *Mendenhall,* 446 U.S. 544, 553–54, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980)." *State* v. *Ostroski,* supra, 291–92; see also *Miranda* v. *Arizona,* supra, 444. In this case Acquin had just been questioned for three hours by the police, he had heard an order to return him to the police barracks, he was surrounded by police officers, and the senior officer had placed a hand on his shoulder. Although Shay did not declare "I seize you in the name of the State," his classic gesture could not have been more clear. No reasonable person could have believed that he or she

was free to leave. The defendant was in custody at that time. *United States* v. *Mendenhall,* supra; *State* v. *Ostroski,* supra.

The defendant contends, however, that he was in custody at approximately 9:30 a.m. when he was first questioned. The record reveals the following undisputed facts: The defendant voluntarily agreed to accompany the officers, first to Bethany, then to Meriden. The questions asked of him concerned the Beaudoin family, whom he knew well, and his contact with them the previous day. When he asked to go home, all questioning stopped, he was promptly taken to a police car, and the police started to drive him home. No claim is made that he was restrained or coerced in any way during the initial interview. Under the undisputed facts before us, no reasonable person could have considered that he was not free to leave at that time. The defendant was not in custody until he was seized by Shay at approximately 2 p.m.

## 2

### Probable Cause

" 'Probable cause exists when the facts and circumstances within the knowledge of the officer and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution to believe that a felony had been committed.' *State* v. *Wilson,* 153 Conn. 39, 42, 212 A.2d 75 [1965]"; *State* v. *Wilson,* 178 Conn. 427, 435–36, 423 A.2d 72 (1979); and that the person arrested committed it. *State* v. *DeChamplain,* 179 Conn. 522, 529, 427 A.2d 1338 (1980); see *Brinegar* v. *United States,* 338 U.S. 160, 175–76, 69 S. Ct. 1302, 93 L. Ed. 1879 (1949); *Carroll* v. *United States,* 267 U.S. 132, 162, 45 S. Ct. 280, 69 L. Ed. 543

(1925). The quantum of evidence necessary to establish probable cause exceeds mere suspicion, but is substantially less than that required for conviction. Our cases have made clear that "[t]here is often a fine line between mere suspicion and probable cause, and '[t]hat line necessarily must be drawn by an act of judgment formed in light of the particular situation and with account taken of all the circumstances.' *Brinegar* v. *United States,* supra, 176." *State* v. *Penland,* 174 Conn. 153, 155–56, 384 A.2d 356, cert. denied, 436 U.S. 906, 98 S. Ct. 2237, 56 L. Ed. 2d 404 (1978). Furthermore, when we test the quantum of probable cause, it is not the personal knowledge of the arresting officer but the collective knowledge of the law enforcement organization at the time of the arrest which must be considered. *State* v. *Runkles,* 174 Conn. 405, 411, 389 A.2d 730, cert. denied, 439 U.S. 859, 99 S. Ct. 177, 58 L. Ed. 2d 168 (1978); *State* v. *Romano,* 165 Conn. 239, 246, 332 A.2d 64 (1973); *State* v. *Cobuzzi,* 161 Conn. 371, 377, 288 A.2d 439 (1971), cert. denied, 404 U.S. 1017, 92 S. Ct. 677, 30 L. Ed. 2d 664 (1972).

It is uncontested that the following facts were known to the police before Shay approached the defendant on Route 69 at about 2 p.m.: Nine bodies had been found, all badly beaten and some tied up, in the burned-out Beaudoin house. The fire was the result of arson. Acquin was the foster brother of Fred Beaudoin, Sr. and a frequent visitor to the Beaudoin home. Acquin had been at the house from at least 7:30 to 10 p.m. on the previous evening, July 21. Acquin had recent scratches on his face, which he explained were the result of a mugging the night before. In Zdanowicz's opinion, the injuries were not consistent with this explanation. Acquin had not reported the mugging to the

police, and had not mentioned it at all in his oral statement to the police at approximately 9:30 a.m. Resident state troopers in Bethany considered Acquin to be violent by nature on the basis of past experience. Acquin had once lived at the Beaudoin house and the house had caught on fire during that period.

In addition, police had interviewed Fred Beaudoin, Sr. and Alden Brooks, the only living people other than Acquin known to have been at the house on the night of July 21–22. Beaudoin had been at work when the fire broke out at approximately 3:45 a.m., and Brooks had apparently offered an acceptable account of his own whereabouts. When Acquin was told of the fire and deaths at 9:30 a.m. he showed neither surprise nor emotion. Rose Ann Paolino, who reported the fire at 3:45 a.m., had seen a dark colored car speeding away at that time. Acquin often drove a black Rambler, and had been driving it earlier in the evening.[4] Finally, Fred Beaudoin, Jr., one of the child victims, had told a playmate that Acquin was going to sleep overnight at the Beaudoin home on the night of the murders.

The defendant's contention that the police had information which implicated others as possible suspects need not detain us. The function of this court is not to second-guess the reasonable and logical conclusions of experienced police officers at

---

[4] The defendant stresses the fact that Paolino stated that the taillights she saw were round, and that the taillights of the Rambler were rectangular. It is not clear from the record, however, whether this discrepancy was known to the police at 2 p.m. Furthermore, a probable cause determination involves an evaluation of the totality of evidence available, and often must disregard minor discrepancies in that evidence.

the time of their determination of probable cause. Nor are we concerned with a retrospective look at the truth or falsity of the information which police had at the time of the arrest. *Brinegar* v. *United States,* supra, 176.[5]

We hold that the defendant was in custody on Route 69 at 2 p.m., and that the custody was legal because there was probable cause to arrest him at that time.

## B

### THE FIFTH AMENDMENT CLAIM: MIRANDA

The defendant's graphic and detailed confession to the murders was admitted at trial. The defendant asserted before the trial court, and claims before this court, that the confession was obtained in violation of his right not to be compelled to be a witness against himself under the fifth amendment to the constitution, as interpreted in *Edwards* v. *Arizona,* 451 U.S. 477, 101 S. Ct. 1880, 68 L. Ed. 2d 378, reh. denied, 452 U.S. 973, 101 S. Ct. 3128, 69 L. Ed. 2d 984 (1981), and *Miranda* v. *Arizona,* supra.

After his encounter with Shay on Route 69 in Prospect at approximately 2 p.m., Acquin was brought to the Prospect command post. He was

---

[5] The Supreme Court in *Brinegar* v. *United States,* 338 U.S. 160, 176, 69 S. Ct. 1302, 93 L. Ed. 1879 (1949), held: "Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable [persons], acting on facts leading sensibly to their conclusions of probability. The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating these often opposing interests [of individual rights versus community protection]. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice."

again read the *Miranda* rights and then questioned at length by Hamila regarding his activities of the preceding two days. At approximately 5:45 p.m. Acquin interrupted himself in midsentence and stated that he wanted a lawyer.[6]

Hamila reported Acquin's request for counsel to Captain Thomas McDonnell of the Connecticut state police, who had assumed overall command of the investigation. McDonnell told Hamila to get something to eat. McDonnell then went into the room with Acquin and talked with him for over half an hour in an attempt to discover who Acquin wanted to represent him. McDonnell suggested Acquin's previous attorney and the public defender. Acquin rejected both, as he did the suggestion that his brother be called to get him an attorney. After some time, Acquin indicated that "it wasn't really an attorney that he wanted, it was just somebody he could trust," and that he wanted Joel Albert, a psychiatrist working with prisoners in the New Haven jail. Acquin also indicated "that as soon as Albert got there that he would tell us the truth

---

[6] Hamila testified on cross-examination:

"Q. Okay. While you were at the Prospect Town Hall you told us there came a time, around five-forty-five p.m., when Mr. Acquin asked for a lawyer. Would you relate in detail the circumstances surrounding that request?

A. [Trooper Hamila] I was taking a statement from him at the Town Hall. And, as we were talking Lorne just stopped in the middle of a sentence or whatever I had written there and he told me, he says: I think I'm in trouble, I think I better get a lawyer. And, I says: do you want a lawyer. He says: I think I better get a lawyer, I think I got trouble.

Q. And, then what?

A. I stopped right there. I went to the door, I opened the door and called for Captain McDonnell. And, Captain McDonnell came to the room. I says: I think Lorne wants a lawyer."

about what happened the night before."[7] McDonnell broke off the conversation at that point, and ordered Shay to find and to summon Albert. He

[7] Because the conversation between McDonnell and Acquin is central to our holding, McDonnell's testimony on direct examination is set out at length below:

"Q. All right. Now, it was in the vicinity of six o'clock when you talked to Trooper Hamila regarding this lawyer; is that right?

A. That's right.

Q. And, he left. What did you do?

A. I went in the room with Lorne Acquin and shut the door. And, it was just he and I in the room at that time.

Q. When you entered the room was there anybody else there besides Acquin?

A. No.

Q. What, if anything, did you say to Acquin?

A. I told him that: Trooper Hamila told me that you want an attorney.

Q. What did he say?

A. He said: yes, he did.

Q. And, then what did you say?

A. I asked him who he wanted. And, there were very long pauses before he would respond to my questions. And, then he said he didn't know; asked him: did he have anyone in particular in mind. He said no. I asked him: how about the attorney that you had last time. And, he told me that he didn't trust that attorney and he didn't want him. I asked him—told him that: was there anybody else, another attorney. He said no, there wasn't another attorney that he wanted or trusted. I asked— Then I told him: if he couldn't pick an attorney that I would make calls and get a public defender or the state would provide an attorney for him. And, he replied to that that he didn't want the attorney that we—that I would call. He said: it would be just like talking to another cop. He didn't want any attorney that we choose. I then asked him about his family. I told him: I was pretty sure that his brother was in the building someplace, although I hadn't seen his brother, could his brother get an attorney for him.

Q. What did he say?

A. He said no. He didn't want his brother to get involved. He didn't want his brother to even know he was in the building or he didn't want his brother to know that he was involved here in the building with us.

Q. Then what happened?

A. Then we continued to talk about how would we find him an attorney, how would we get an attorney for him. And, he said that he—it wasn't really an attorney that he wanted, it was just somebody

then returned to the interrogation room, and he and Acquin decided to get something to eat.

Hamila returned shortly thereafter, and McDonnell, Hamila and Acquin drove to a restaurant nearby, where they ate hamburgers in the police cruiser.

Acquin was not handcuffed or physically restrained during this trip. At Acquin's request he was taken to Bethany rather than back to Prospect, where a crowd of reporters had gathered.

that he could trust. He wanted to sit and have somebody sitting with us that he trusted before he had any further conversation. And, I asked him who that, you know—is there such a person, who can we get for you. And, he suggested a Dr. Albert, who I was not familiar with and didn't know who he was. And, I asked who he was and how he knew him. And, he told me that he knew him from the New Haven Jail and he thought he was employed at the New Haven jail.

About that time I went out to Lieutenant Shay and I told Lieutenant Shay that he wanted a Dr. Albert and to get a hold of Dr. Albert and have him come to the command center where we were.

Q. Did you ask Acquin whether or not Dr. Albert was a lawyer?

A. Yes, I did. And, he said that he knew he was a—I think he was referring to him by a slang expression. He was calling him either a shrink or a head doctor or something like that, but wasn't sure whether or not he was an attorney. And, I told him that, you know, that Dr. Albert couldn't play the part of an attorney if, in fact, he wasn't an attorney. And, Acquin just kept saying that he wasn't really concerned about that, what he wanted was somebody to sit in that he could trust and be with him.

Q. Did he say he trusted Dr. Albert?

A. He said he trusted a Dr. Albert very, very much. In fact, he said that, while this conversation was going on, that he had told me and Dr. Albert some things that we were the only two he had ever told, he hadn't even told some of his family members.

Q. And, how long did this conversation go on?

A. Well, from the time I went in the room until I came out and told Shay—I would say from a half to three quarters of an hour or so. . . .

Q. After he said he wanted to see Dr. Albert, what happened?

A. Well, that is when I told Shay to make arrangements to find Dr. Albert. And, I did that as soon as Acquin said: that as soon as Dr. Albert got there that he would tell us the truth about what happened the night before."

In Bethany, Acquin was left alone in a room to wait for Albert. He curled up in an armchair and slept or rested for about two and one-half hours, when Albert finally arrived at approximately 11:40 p.m. on July 22. McDonnell woke Acquin up, and asked whether he still wanted to see Albert and to tell his story. Acquin said he did, and the two of them joined Albert in another room. McDonnell told Acquin that Albert was not an attorney and reminded him that any statement made could be used against him in court;[8] and at Albert's request, McDonnell then left the room. Albert determined that Acquin did want him there, and called McDonnell back in. Neither Acquin nor Albert mentioned an attorney.[9] On direct examina-

---

[8] McDonnell testified on direct examination:

"A. I first went down, told Lorne Acquin that Dr. Albert was here and did he still want to see him and that he still wanted to talk with us while Dr. Albert was present. And, he said: yes, he did. So, I went back to the room and got Dr. Albert. And, Dr. Albert came into the room. And, the three of us then sat in the room.

Q. And, what happened then?

A. Again, I attempted to make it very clear to Lorne that Dr. Albert was not an attorney. I had already inquired of that fact, that Dr. Albert—found out he was not an attorney and that he couldn't act in the capacity of an attorney. And, I told him that anything that he told Dr. Albert while I was seated there and listening and anything that I overheard, that I would be able to testify to against him and use any information obtained during that conversation against him in court."

[9] Albert testified on direct examination at the suppression hearing about his encounter with Acquin:

"Q. Could you describe Lorne Acquin when you first observed him this night, Doctor?

A. Mr. Acquin came in. He seemed to be waking up. He came over to me and greeted me and I greeted him. He seemed collected. He seemed to be glad to see me.

Q. What, if anything, did he say to you?

A. I believe we exchanged greetings. I think he said, 'Hi, Doc.' I said, 'Hi, Lorne.' Something of that nature.

Q. What, if anything, did he say?

A. What's that?

tion, McDonnell described the conversation which followed:

Q. Then what, if anything, did he say?

A. At one point or other I remember quite well he, in the presence of myself and Captain McDonnell, he said, 'Well, Doc, I really did it this time.' And I had no understanding of what that meant at that time.

Q. After this greeting and this comment, was there a period you were alone with Acquin?

A. Yes. I told the Captain that I wanted to see Mr. Acquin alone, and he left the room.

Q. He left the room?

A. Yes.

Q. And both of you were left in the room alone together?

A. That's correct.

Q. What was the conversation you had with him?

A. I asked Mr. Acquin whether he wanted me to be present, in fact, with him, and he said he did.

Q. Could you tell us, Doctor, if he said no, what would you have done?

A. I would have left.

Q. As he said yes—

A. I probably would have also asked him what was going on, things of that nature.

Q. But you would not have remained?

A. No, not at all.

Q. After this short conversation what happened?

A. Then I—once I was assured Mr. Acquin did want me to be there as a witness, I called the Captain in.

Q. What, if anything, did you say to the Captain?

A. I didn't say anything to the Captain.

Q. What happened next? Did anybody say anything?

A. At that point the Captain said something to the effect that 'Dr. Albert is here now and you said you wanted to say something else to us, or make a statement,' something of that nature, at which point Mr. Acquin went into a rather graphic confession of the killings.

Q. Do you recall how this began?

A. Spontaneously on Mr. Acquin's part.

Q. Do you recall the first thing he said in regards to—

A. As a matter of fact, I think that—I'm quite sure but I'm not absolutely sure that Captain McDonnell reminded Mr. Acquin of his legal rights prior to Mr. Acquin making any—you know, going into any statement or details of what had gone on that previous evening.

Q. Do you recall the words used by Captain McDonnell?

A. No, I can't recall that.

"A. They [sic] then asked Lorne Acquin: do you want to tell us what happened last night. And, he said: no, I don't want to tell you.

Q. And, what did you say?

A. I said: well, I thought you said when Dr. Albert got here that you would tell us the truth about what happened last night. And, he said: well, what I mean is, it's—I don't want to tell you, I want you to ask me questions, I can't go through it all again. So, I asked him questions.

Q. Did you ask him questions?

A. Yes.

Q. What did you ask him first?

A. First question I asked him was: how did you really get those cuts. Previously he told us he got the cuts during an assault, he was assaulted by some people up in the Waterbury area. And, his reply to my question was that he didn't get the cuts from those guys the way he told me.

Q. And—

A. And, then I asked him: did you kill all those people. And, he said: yes, he did. And, then without any further questions for quite some time, he went into a narrative about what happened the night before."

Q. Did he say he didn't have to say anything or words to that effect?

A. Yes.

Q. All right. Do you recall the first thing that Lorne Acquin said in regards to the killings?

A. I might just add that he also—I'm quite sure that he made it clear that it was possible if Mr. Acquin wanted to have counsel present.

Q. I see. This was before he gave the confession?

A. That's correct.

Q. What happened after he said that?

A. Then Mr. Acquin went into his statement.

Q. I see. Do you recall—this is an oral statement?

A. It was a spontaneous oral statement."

The defendant claims that the facts before us establish as a matter of law that his confession was obtained in violation of his constitutional rights. We disagree.

Any inquiry into the admissibility of a confession obtained while a defendant is in custody must of course begin with *Miranda* v. *Arizona,* supra. In that case, the United States Supreme Court held that the fifth and fourteenth amendments' prohibition against compelled self-incrimination requires that a suspect in police custody be informed specifically of his or her right to remain silent and to have an attorney present before being questioned. *Miranda* v. *Arizona,* supra, 444, 479. The court further held that "[i]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease"; id., 473–74; and "[i]f the individual states that he wants an attorney, the interrogation must cease until an attorney is present." Id., 474. Furthermore, "[i]f the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." Id., 475. The standard for waiver is that announced in *Johnson* v. *Zerbst,* 304 U.S. 458, 464, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938): "A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege. . . . [which] must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." Accord, *North Carolina* v.

*Butler,* 441 U.S. 369, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979); *State* v. *Wilson,* 183 Conn. 280, 439 A.2d 330 (1981).

The Supreme Court recently reconfirmed the principles stated above in *Edwards* v. *Arizona,* supra, where the court held: "[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Id., 484–85.

The defendant contends that *Edwards* v. *Arizona,* supra, establishes a per se rule that once an accused has asked for counsel, any further questioning of any kind by the police violates his fifth amendment rights.

We do not, however, construe the *Edwards* opinion so broadly. To do so would transform the *Miranda* safeguards "into wholly irrational obstacles to legitimate police investigative activity, and deprive suspects of an opportunity to make informed and intelligent assessments of their interests." *Michigan* v. *Mosley,* 423 U.S. 96, 102, 96 S. Ct. 321, 46 L. Ed. 2d 313 (1975). We believe that the *Edwards* opinion is a restatement of existing principles of constitutional law, and is not intended to overrule decided cases. *Edwards* does not prohibit communication between police and a suspect

who has requested an attorney. Rather it prohibits the use of confessions obtained when police "initiate" renewed custodial interrogation after such a request. The Supreme Court has stated quite clearly that the *Miranda* safeguards are relevant only when an in-custody accused is subjected to interrogation. " 'Interrogation' " means "any words or actions . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island* v. *Innis,* 446 U.S. 291, 301, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980); see *State* v. *Falby,* 187 Conn. 6, 15, 444 A.2d 213 (1982); *State* v. *Graham,* 186 Conn. 437, 443, 441 A.2d 857 (1982). The per se rule suggested by the defendant would negate the holding in *Innis* by forbidding any conversation initiated by police after a request for counsel whether or not "likely to elicit an incriminating response." But the majority in *Edwards* was careful to disavow any intention to overrule the interrogation requirement of *Miranda* and *Rhode Island* v. *Innis,* supra, stating: "The Fifth Amendment right identified in *Miranda* is the right to have counsel present at any custodial interrogation [absent which] . . . there would have been no infringement of the right that Edwards invoked . . . ." *Edwards* v. *Arizona,* supra, 485–86.

The relevant inquiry when a defendant has clearly invoked his right to counsel is to ask, first, was there in fact *interrogation* and, second, did the police *initiate* it. *Edwards* v. *Arizona,* supra, 490 (Powell, J., concurring in the result).[10]

---

[10] Our conclusion that *Edwards* v. *Arizona,* 451 U.S. 477, 101 S. Ct. 1880, 68 L. Ed. 2d 378, reh. denied, 452 U.S. 973, 101 S. Ct. 3128, 69 L. Ed. 2d 984 (1981), does not announce new principles is supported by most courts which have ruled on the question. See *United States* v. *Halliday,* 658 F.2d 1103 (6th Cir. 1981); *Richard-*

It is unquestioned that Acquin was read the *Miranda* rights before any statement was taken, and it appears clear from the record that he understood those rights. It is also undisputed that he specifically requested an attorney at 5:45 p.m. ("I think I'm in trouble. I think I better get a lawyer."), and that he confessed several hours after that request. *Edwards* and *Miranda* require, therefore, that we examine two incidents which occurred after the defendant's request: (1) McDonnell's inquiries about whom the defendant wanted as an attorney; and (2) the events immediately following the arrival of Albert in Bethany, which immediately preceded the confession.

## 1

### Inquiries about Counsel

When Acquin said, "I think I better get a lawyer," Hamila, who was questioning him, stopped immediately and reported the request to his superior, McDonnell. McDonnell proceeded to ask further questions of the defendant in an attempt to ascertain whom he wanted to represent him. McDonnell offered to call: Acquin's previous attorney, any other attorney, and the public defender. Acquin said he didn't want any of them. McDonnell then offered to find Acquin's brother, who he thought was "in the building someplace" and have him obtain an attorney. Again Acquin refused the offer, indicating that "he didn't want his brother to know that he was involved . . . ." On further inquiry about how to find a lawyer, Acquin indicated that "it wasn't really an attorney that he wanted,

*son* v. *State*, 625 S.W.2d 504, 507 (Ark. 1981); *People* v. *Denby*, 102 Ill. App. 3d 1141, 430 N.E.2d 507 (1981); *Bryant* v. *State*, 49 Md. App. 272, 431 A.2d 714 (1981); *State* v. *Scott*, 626 S.W.2d 25 (Tenn. Crim. App. 1981).

it was just somebody that he could trust," and asked that Albert be present before he made a statement. Acquin told McDonnell "that as soon as Dr. Albert got there that he would tell ... the truth about what happened the night before." McDonnell then ordered a search for Albert.

The questions asked by McDonnell were not interrogation. They were not of the kind likely to elicit an incriminating response. Rather, they were limited to information which would allow McDonnell to comply with the defendant's request for counsel by ascertaining who should be called. Questions of this type, when limited to finding the attorney of the suspect's choice, are not forbidden by *Miranda* and its progeny. The right to counsel is of little use to an accused if police are not allowed to ascertain whom to summon. McDonnell suggested several different ways for the defendant to obtain legal advice, and even offered to call the defendant's brother. Such carefully limited questions cannot reasonably be considered interrogation, and would be proper whether or not the defendant's request for counsel was "equivocal." See *Nash* v. *Estelle*, 597 F.2d 513 (5th Cir. 1979) (en banc).[11]

2

The Confession

Albert arrived in Bethany at about 11:40 p.m., more than five hours after Acquin told McDonnell that he would "tell the truth about what happened last night" if Albert were present. The two met alone, very briefly, and then Albert called McDonnell back into the room. McDonnell was careful to explain that Albert was not an attorney, and that if Acquin said anything to Albert in

_____

[11] See discussion of this case, infra, 673.

McDonnell's presence, it could be used in court. McDonnell testified on direct examination to the ensuing conversation: "I then asked Lorne Acquin: do you want to tell us what happened last night. And, he said: no, I don't want to tell you. . . . I said: well, I thought you said when Dr. Albert got here that you would tell us the truth about what happened last night. And, he said: well, what I mean is, it's—I don't want to tell you, I want you to ask me questions, I can't go through it all again. So, I asked him questions." A detailed confession followed.

*Edwards* v. *Arizona,* supra, holds that confessions obtained after a request for counsel are inadmissible if they are the result of renewed custodial interrogation "initiated" by the police. In *Edwards,* the defendant was arrested for robbery, burglary and murder, advised of his rights, and then questioned about the crimes. After giving a statement presenting an alibi defense, Edwards sought to make a deal. He then stated: " 'I want an attorney before making a deal.' " Police immediately ceased all questioning, and Edwards was locked up. The next morning, two detectives came to the jail and asked to see Edwards, who told the guard that he did not want to talk to anyone. The guard replied that " 'he had' " to talk to them, and took him to an interrogation room where he was played a recording of an "alleged accomplice who had implicated him" in the crimes. Edwards then gave a second statement which incriminated him. *Edwards* v. *Arizona,* supra, 478–79. It was the second statement which was excluded by the Supreme Court decision in *Edwards.*

We have already indicated that we do *not* read *Edwards* to prescribe a per se rule that a confession

which follows *any* conversation initiated by police after a request for counsel must be suppressed. We agree with Justice Powell, concurring in *Edwards* v. *Arizona,* supra, 488–492, that "few cases will be as clear as [*Edwards*]. Communications between police and a suspect in custody are commonplace. It is useful to contrast the circumstances of this case with typical, and permissible, custodial communications between police and a suspect who has asked for counsel. For example, police do not impermissibly 'initiate' renewed interrogation by engaging in routine conversations with suspects about unrelated matters. And police legitimately may inquire whether a suspect has changed his mind about speaking to them without an attorney. E.g., *State* v. *Turner,* 32 Ore. App. 61, 65, 573 P.2d 326, 327 (1978); see *State* v. *Crisler,* 285 N.W.2d 679, 682 (Minn. 1979); *State* v. *Marcum,* 24 Wash. App. 441, 445–446, 601 P.2d 975, 978 (1979)." Id., 490.

Unquestionably, the defendant invoked his right to counsel. "I think I better get a lawyer" could hardly be more clear; however, subsequent legitimate questions to find out whom he wanted showed that the request was not as unequivocal as it appears to be on its face. Acquin stated, among other things, that "it wasn't really an attorney that he wanted, it was just somebody that he could trust. He wanted to sit and have somebody sitting with us that he trusted before he had any further conversation."

We note in this regard Fifth Circuit cases which foreshadowed the decision in *Edwards* v. *Arizona,* supra, and which the *Edwards* majority approved: "The rule in the Fifth Circuit is that a knowing and intelligent waiver cannot be found once the Fifth

Amendment right to counsel has been clearly invoked unless the accused initiates the renewed contact. See, e.g., *United States* v. *Massey,* 550 F.2d 300 ([5th Cir.] 1977); *United States* v. *Priest,* 409 F.2d 491 ([5th Cir.] 1969). Waiver is possible, however, when the request for counsel is equivocal. *Nash* v. *Estelle,* 597 F.2d 513 ([5th Cir.] 1979) (en banc). See *Thompson* v. *Wainwright,* 601 F.2d 768 ([5th Cir.] 1979)." *Edwards* v. *Arizona,* supra, 486 n.9.

In *Nash* v. *Estelle,* 597 F.2d 513 (5th Cir. 1979) (en banc), in upholding the admission of a confession, the court stated: "When police stop interrogation as required [after a request for counsel], admissions that later come at the initiative of a suspect are subject to the traditional analysis for voluntariness. ... The same principle governs when . . . a suspect who has been informed of his rights expresses both a desire for counsel and a desire to continue the interview without counsel. Where the suspect's desires are expressed in such an equivocal fashion, it is permissible for the questioning official to make further inquiry to clarify the suspect's wishes." (Citations omitted.) Id., 517. In *Nash* v. *Estelle,* supra, the accused, Nash, was advised of his rights prior to questioning. His "equivocal" request for counsel began unequivocally: "Nash: Well, I don't have the money to hire one, but I would like, you know, to have one appointed. [Prosecutor] Files: You want one to be appointed for you? Nash: Yes, sir." Id., 516. The relevant dialogue is quoted in the footnote.[12] In *Thompson*

---

[12] "Nash: 'I understand that I do—I don't have to tell him anything, and what I say can be used against me in Court. I do not want to—I mean I do not want to have a lawyer present in Court, I mean at this time.

v. *Wainwright,* 601 F.2d 768 (5th Cir. 1979), also cited in *Edwards* v. *Arizona,* supra, the Fifth Circuit clarified the rule: "[W]henever even an equivocal request for an attorney is made by a suspect during custodial interrogation, the scope of that interrogation is immediately narrowed to one subject and one only. *Further questioning thereafter must be limited to clarifying that request* until it *is* clarified. When and if it is clarified as a present desire for the assistance of legal counsel,

Files: Then the place under that is—

Nash: If I want a lawyer present, I just put down I want him present?

Files: Please just tell us about it. Any time we are talking and you decide that you need somebody else here, you just tell me about it and we will get somebody up here.

Nash: Well, I don't have the money to hire one, but I would like, you know, to have one appointed.

Files: You want one to be appointed for you?

Nash: Yes, sir.

Files: Okay. I had hoped that we might talk about this, but if you want a lawyer appointed, then we are going to have to stop right now.

Nash: But, uh, I kinda, you know, wanted, you know, to talk about it, you know, to kinda, you know, try to get it straightened out.

Files: Well, I can talk about it with you and I would like to, but if you want a lawyer, well, I am going to have to hold off, I can't talk to you. It's your life.

Nash: I would like to have a lawyer, but I'd rather talk to you.

Files: Well, what that says there is, it doesn't say that you don't ever want to have a lawyer, it says that you don't want to have a lawyer here, now. You got the right now, and I want you to know that. But if you want to have a lawyer here, well, I am not going to talk to you about it.

Nash: No, I would rather talk to you.

Files: You would rather talk to me. You do not want to have a lawyer here right now?

Nash: No, sir.

Files: You are absolutely certain of that?

Nash: Yes, sir.

Files: Go ahead and sign that thing." *Nash* v. *Estelle,* 597 F.2d 513, 516–17 (5th Cir. 1979) (en banc).

*all* interrogation must cease . . . ." (Emphasis in original.)  *Thompson* v. *Wainwright,* supra, 771.

We believe that *Edwards* v. *Arizona* must be read to include this common-sense Fifth Circuit rule, which was implicitly approved by the majority, and specifically stated in Justice Powell's concurring opinion.[13]

In the case before us, the defendant's request for counsel was more "equivocal" than Nash's. Although, like Nash, Acquin clearly asked for counsel, he also rejected every suggestion for obtaining an attorney, including talking to his own brother. Instead he stated that he would "tell the truth" if the police allowed Albert to be there. The trial court found that "the defendant's request for counsel was indecisive and under the circumstances Captain McDonnell was correct in making an inquiry into whether the suspect did or did not want counsel present." The record amply supports the trial court's conclusion that the defendant's request was "indecisive" and therefore equivocal. We cannot therefore say that this conclusion is clearly erroneous under the well-established standard of factual review. Practice Book

[13] "[P]olice legitimately may inquire whether a suspect has changed his mind about speaking to them without an attorney." *Edwards* v. *Arizona,* 451 U.S. 477, 490, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (Powell, J. concurring in the result), reh. denied, 452 U.S. 973, 101 S. Ct. 3128, 69 L. Ed. 2d 984 (1981). This rule is also in accord with the decision in *State* v. *Scott,* 626 S.W.2d 25 (Tenn. Crim. App. 1981). There, the police stopped questioning when the defendant requested counsel. On his way to the holding cell, however, the defendant stopped to talk with his girlfriend. The escorting officer "heard her informing appellant he should tell the truth. [The officer then] asked appellant if he wanted to talk about it or go ahead to the detention area." Id., 29. The court held that "[t]hese facts cannot be equated with a resumption of the interrogation as condemned by *Edwards* v. *Arizona,* supra." Ibid.

§ 3060D; *Kaplan* v. *Kaplan,* 186 Conn. 387, 392, 441 A.2d 629 (1982); *Pandolphe's Auto Parts, Inc.* v. *Manchester,* 181 Conn. 217, 221-22, 435 A.2d 24 (1980).

The finding of indecisiveness alone, however, does not settle the question of admissibility of the confession. This exception to the general rule of *Edwards* is very narrowly circumscribed. The facts of this case demonstrate the limits of the inquiry which can be made. McDonnell limited his clarifying questions carefully to the subject of whom Acquin wanted as his counsel. No question implied in any way that the request might be denied, or that it would be advisable to talk before obtaining counsel. Five hours passed before Albert arrived. McDonnell then told Acquin that the doctor was there and asked whether he still wanted to see him and to give a statement. The defendant answered affirmatively. Albert and Acquin conferred alone, then Albert called McDonnell in. McDonnell again explained the legal consequences of making a statement[14] and then asked whether Acquin wanted to tell them what happened the night before. When Acquin said "I don't want to tell you," McDonnell expressed his confusion, whereupon Acquin explained "[w]ell, what I mean is . . . I don't want to tell you, I want you to ask me questions . . . ." This clarification from the defendant indicated his desire to talk. The scope of questioning here compares favorably with that of the prosecutor in *Nash* v. *Estelle,* supra, 516. The inquiries of McDonnell were limited to those necessary to clarify the defendant's equivocation and to ascertain that he was aware of the consequences of giving a statement.

[14] See footnote 7, supra.

The defendant's confession was not obtained in violation of *Edwards* v. *Arizona,* supra, because his request for counsel was equivocal.

## 3

### Waiver

Our conclusion that the defendant's confession is not made inadmissible solely because he had previously asked for an attorney does not end the inquiry. The trial court correctly stated that "[t]he next question is whether the defendant 'voluntarily, knowingly and intelligently' waived his rights. The state has a 'heavy burden' of demonstrating that the suspect's constitutional rights have been respected. *State* v. *Darwin,* 29 Conn. Sup. 423, 432 [290 A.2d 593 (1972)]. Waiver has been defined as 'an intentional relinquishment or abandonment of a known right or privilege.' *Johnson* v. [*Zerbst*], 304 U.S. 458, 464 . . . 58 S. Ct. 1019, 1023, 82 L. Ed. 1461, 1466 [1938]. This standard is applied to an in-custody interrogation. *Miranda,* supra, 475." A finding of waiver involves two interrelated factual determinations: (1) did the defendant understand his rights; and (2) did he voluntarily relinquish them. *State* v. *Wilson,* 183 Conn. 280, 284, 439 A.2d 330 (1981); *State* v. *Derrico,* 181 Conn. 151, 157–58, 434 A.2d 356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed. 2d 607 (1980); *North Carolina* v. *Butler,* supra. The trial court in its discretion makes these determinations, but that discretion must be "exercised in accordance with constitutional standards of due process." *State* v. *Derrico,* supra, 162–63. The trial court found, and the record indicates, that the defendant was given the *Miranda* warnings five times, that he understood his rights, and that

neither threats nor physical force were used on the defendant. Moreover, the defendant had been arrested and advised of his rights several times before. One of the unusual facts of this case is that Albert, a professional psychiatrist who was called to the scene at the defendant's request, was present during the events leading up to the confession. He witnessed the entire confession, and testified that in his opinion the defendant "seemed collected," and understood the meaning of the warnings given to him. Albert also stated that the confession was given "spontaneously" and that he felt the defendant had a psychological need to tell the story. Acquin also indicated twice that he wanted to tell the truth, but that he just wanted somebody he could trust (Albert) to be there.

We cannot say that, on the basis of the evidence before it, the trial court erred in concluding that the defendant knowingly and voluntarily waived his rights to counsel and to remain silent. There is simply no evidence that the circumstances were such as to " 'overbear . . . [the accused's] will to resist . . . .' " *State* v. *Devine,* 149 Conn. 640, 653, 183 A.2d 612 (1962); *Culombe* v. *Connecticut,* 367 U.S. 568, 602, 81 S. Ct. 1860, 6 L. Ed. 2d 1037 (1961).

On the basis of the foregoing we conclude that the trial court did not err in admitting the defendant's confession.[15]

---

[15] The defendant also claims that his confession was illegally obtained because at approximately 6:30 p.m. McDonnell "asked him [Acquin]: what other scratches he had beside the one[s] I can see on his face and his arms." Acquin responded by dropping his trousers to show a scratch or burn mark on his thigh. The defendant now contends that McDonnell's question violated the rule in *Edwards* v. *Arizona,* 451 U.S. 477, 101 S. Ct. 1880, 68

## II

### THE HEARSAY STATEMENT

At trial the defendant offered in evidence a signed written statement given to a state policeman by John Ricciuti, owner of a bar which the defendant had visited the night of the murders. Ricciuti, a fugitive from New Jersey authorities, could not be located and was unavailable to testify. The statement indicated that the defendant was not drunk at 1 a.m., and therefore contradicted the testimony of Deborah Veilleux that the defendant had slurred speech and "walked kind of staggered." The court refused to admit the Ricciuti statement on the ground that it was hearsay.

L. Ed. 2d 378, reh. denied, 452 U.S. 973, 101 S. Ct. 3128, 69 L. Ed. 2d 984 (1981), and that his confession therefore should have been suppressed.

We do not consider this episode to merit extensive discussion for several reasons. First, as outlined above, the request for counsel was equivocal and, therefore, did not bar all further questions. Second, there was no causal connection between the "scratches" question and the confession made more than five hours later after Albert had arrived and spoken to Acquin. See *Edwards* v. *Arizona*, supra, 488–92 (Powell, J., concurring in the result); *Michigan* v. *Mosley*, 423 U.S. 96, 107–11, 96 S. Ct. 321, 46 L. Ed. 2d 313 (1975) (White, J., concurring in the result); cf. *Brown* v. *Illinois*, 422 U.S. 590, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975); *Wong Sun* v. *United States*, 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). Finally, it is an open question whether the "scratches" episode can be considered interrogation at all, because the defendant was asked only to supply nontestimonial evidence of the condition of his body which he might have been compelled to give without any violation of his constitutional rights, whether or not counsel was present. See *Schmerber* v. *California*, 384 U.S. 757, 86 S. Ct. 1826, 16 L. Ed. 2d 908 (1966); see also *United States* v. *Wade*, 388 U.S. 218, 87 S. Ct. 1926, 18 L. Ed. 2d 1149 (1967); *State* v. *Adams*, 176 Conn. 138, 141–42, 406 A.2d 1 (1978); *State* v. *Chesney*, 166 Conn. 630, 640–41, 353 A.2d 783, cert. denied, 419 U.S. 1004, 95 S. Ct. 324, 42 L. Ed. 2d 280 (1974) and cases cited therein.

Unquestionably the statement was hearsay, and therefore admissible only if permitted under some exception to the rule. *Izzo* v. *Crowley,* 157 Conn. 561, 563, 254 A.2d 904 (1969); see Tait & LaPlante, Handbook of Connecticut Evidence (1976) c. 11. The defendant has not shown or even argued that the Ricciuti statement comes within any exception recognized in Connecticut. See, e.g., *State* v. *Gold,* 180 Conn. 619, 630, 431 A.2d 501, cert. denied, 449 U.S. 920, 101 S. Ct. 320, 66 L. Ed. 2d 148 (1980); *State* v. *DeFreitas,* 179 Conn. 431, 450–51, 426 A.2d 799 (1980). Moreover, here, the trial court specifically found that "there was no evidence that the circumstances surrounding the statement provide any sanction for ascertaining its truth . . ."; that is, the trial court did not find it trustworthy.[16] Nothing before us indicates that this determination was an abuse of discretion, and we find no error in the trial court's decision to exclude the statement.

## III

### CHALLENGE TO THE JURY ARRAY

The jury array from which the jury panel was chosen in this case was 44.82 percent female, while 52.69 percent of registered voters in New Haven County were female, a difference of 7.87 percent. The defendant, after presenting only these facts to the trial court, moved to dismiss the jury panel on the ground that the array from which it was selected was not a fair cross-section of the community. The trial court denied the motion, stating that the

---

[16] Because of this conclusion by the trial court, we need not review whether the statement can be considered exculpatory as we defined the word in *State* v. *Gold,* 180 Conn. 619, 630 n.5, 431 A.2d 501, cert. denied, 449 U.S. 920, 101 S. Ct. 320, 66 L. Ed. 2d 148 (1980).

difference was statistically significant but that it did not constitute in any way an unrepresentative or unfair cross-section of the community.

"In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process." *State* v. *Frazier,* 185 Conn. 211, 216-17, 440 A.2d 916 (1981), quoting *Duren* v. *Mississippi,* 439 U.S. 357, 364, 99 S. Ct. 664, 58 L. Ed. 2d 579 (1979).

The defendant presented no evidence whatsoever to show that this underrepresentation was due to systematic exclusion of the group. *State* v. *Frazier,* supra, 218. Therefore, he failed to make the required prima facie showing, and there was no error in the denial of his motion.

There is no error.

In this opinion the other judges concurred.