[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON MOTION TO SUPPRESS STATEMENTS
The defendant in this case claims a violation of his fourth,fifth, sixth and fourteenth amendment rights under the United States Constitution and article first, sections seven and eight of the Connecticut Constitution.[1] The factual predicate framing the issues is here appropriate. The defendant Pinder's initial contact with the state police occurred in the early morning hours following the demise of Bryan Altvater. That contact was by telephone and, as a result thereof, a meeting with Pinder occurred shortly thereafter at his mother's home in Danbury. At that time, he was cooperative, gave the police a statement, registered no unusual characteristics with the exception of anger as it was described over the fact that Bryan was dead. Subsequent to that interview, the police recognized some inconsistencies in the versions of the actions of the people to whom they had spoken. One such inconsistency was the time line discrepancy between Pinder's version and the decedent's father's version of when he, Pinder, had left for work. The second was the discovery of a towel from the upstairs living quarters of the parents in Pinder's bedroom. It was maintained in the testimony heard by the court that at this time Pinder was no more suspect than anyone else and was in fact a witness, if anything at all. In view of the inconsistencies or the discrepancies, whichever happens to be preferred, he was reinterviewed at Troop A in Southbury and arrived there voluntarily without any question whatsoever, and the court so finds.
At the conclusion of that interview, because the discrepancies and inconsistencies had not been resolved, it was suggested that he submit to a polygraph. He willingly agreed, indicating that he knew something about polygraphs, that he had studied them or had a project on them in school. He was amenable to be examined that very day but the examination could not be so scheduled as a result of prior commitments by the polygraph unit. In addition, he was perceptibly fatigued at that time and the evidence indicates that a fatigued individual is not a proper subject for such testing. Testimony continues that he was most cooperative and willingly agreed to being examined the following day, which was possible because of a cancellation in the unit.
The evidence discloses that he drove to the barracks in CT Page 5884 Southbury by himself, met the troopers, was given the option of following them or riding with them. He chose to ride with them. En route to the polygraph site, they had a cordial, relaxed conversation, and most of that conversation related to computers. One of the troopers was apparently interested in that subject at the time and Mr. Pinder possessed a substantial knowledge thereof.
Upon arrival at the polygraph unit, he was introduced to the examiners, primary and secondary, he was advised of his rights and the advisory process was most detailed and anything but perfunctory. He was asked if he understood his rights, he indicated he did, he was read the advisory and read it to himself. He then signed his initials in the appropriate areas. It was made very clear to him that he could leave at any time that he elected to do so, and that he could stop answering questions anytime he chose on at least three occasions. The entire advisory was not muttered, it was not "rapid fire" and, indeed, was expressed very slowly and very clearly.
"The state has the burden of proving by a preponderance of the evidence that the defendant knowingly and intelligently waived his Miranda rights, including his right to remain silent.State v. Boscarino, 204 Conn. 714, 743 (1987); State v.Hernandez, 204 Conn. 377, 395 (1987). . . . A valid waiver is defined, in accordance with the well-known test of Johnson v.Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), as the intentional relinquishment or abandonment of a known right. . . . [While the mere silence of an accused is insufficient to establish a waiver]; State v. Wilson,183 Conn. 280, 284 (1981);[2] the record need not show a specific expression of relinquishment of rights. State v. Pecoraro,198 Conn. 203, 208 (1985). Instead, a waiver may be inferred from the actions and words of the person interrogated; North Carolina v.Butler, 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979); and from his course of conduct." (Citations omitted; internal quotation marks omitted.) State v. Barrett, 205 Conn. 437, 449-50
(1987). There is no doubt in this court's mind that he clearly understood what his rights were and that his course of conduct indicated that he did in fact waive those rights. It must also be understood that he was not then in CUSTODY. (Emphasis supplied).
An issue has been raised about why he was advised of his rights when he was not in custody and was not a suspect. The response to that was that it was a practice of the polygraph unit CT Page 5885 because, at least on occasion, if not frequently, admissions are made by people who are being subjected to that examination. The witness also testified that this procedure was recommended by a federal judge. Pinder was given a preliminary examination and then the actual lie detector test itself. At one point he said he was nervous and asked if he could take the test the following day. It was explained that because of scheduling difficulties that that could not be accomplished, that he would have to wait a matter of weeks to take it if he chose not to take it that day. Again, it was made very clear to him that he could leave if he were unhappy, he did not have to answer any questions. He could "just walk out" of the area where he was and go wherever he chose to go. At the conclusion of the polygraph, the results were scrutinized by both examiners who concluded that the answers to relevant questions (four in number relating to the homicide) were deceptive.
The primary examiner then confronted him using interrogation tactics that are designed to illicit truthful answers. Without a doubt, much of the interrogation technique is premised upon inaccuracies, misstatements and, in some situations, falsehoods. However, if the advisory of rights is accurate, understood and a waiver manifested, questioning techniques are not necessarily subject to review.
Upon being confronted with the examiner's opinion, which the examiner testified and credibly so, was designed to set forth the worst scenario to evoke a vocal response that was truthful, produced a response that indicated that he had assisted Bryan Altvater in his suicide. That was pursued and it was discovered that this was not truthful.
The case officers then came into the conference room — the polygraph examiners left. Their purpose was obviously to take a statement from him. He was again advised of his rights and, again, very much in detail, very clearly, very slowly and very understandably. He indicated unequivocally that he did understand his rights with no reluctance whatsoever and, again, initialed an advisory at the appropriate places after it had been read to him, as it had been before, and after he had read it himself. He said he understood them and the court is quite satisfied that he again waived his Miranda rights at this stage of the proceeding.
The pivotal problems in this case are both sixth amendment problems as this court sees them. One might reassert a fifth CT Page 5886 amendment issue as well as to the quality of the advisory and the time that it was given or the number of times that it was given. However, this court has addressed that problem earlier in this memorandum. During the preliminary test, there is a segment of the interview which is both video and audio recorded, during the early advisory where he says what appears to be, "[w]hat about a public defender?"[3] That section of the recording leaves much to be desired in the audio presentation. At that time he was advised that they do not appoint public defenders in the polygraph unit. This occurs in a court when a court proceeding is pending. That information was a correct statement of the ordinary practice of appointing public defenders. The question then is, did he in fact invoke his right to counsel at this time during the interview with the secondary examiner.
"We have held that the warnings enunciated by Miranda v.Arizona,[4] supra, originally made applicable in state prosecutions only because of the due process clause of thefourteenth amendment to the United States constitution, are independently required under the due process clause of article first, § 8, of the Connecticut constitution. State v. Chung,202 Conn. 39, 45 n. 7, 519 A.2d 1175 (1987); State v. Simms,201 Conn. 395, 411 n. 12, 518 A.2d 35 (1986); State v. Burge,195 Conn. 232, 246 n. 15, 487 A.2d 532 (1985); State v. Ferrell,191 Conn. 37, 40-41, 463 A.2d 573 (1983); State v. Falby,187 Conn. 6, 11 and n. 1, 444 A.2d 213 (1982). `The warnings represent the belief, deep-seated in the Anglo-American legal tradition, that a person accused of a crime may be convicted only if exacting measures have been taken to assure that the accused has been treated with the most scrupulous fairness by agents of the government.' State v. Ferrell, supra. By informing a person held in custody of the right to consult with an attorney prior to and during police interrogation, the warnings required by article first, § 8, significantly enhance that person's opportunity to make a knowing, intelligent and voluntary decision whether to speak or remain silent. Id. The Miranda warnings reflect the `perception that the lawyer occupies a critical position in our legal system because of his [or her] unique ability to protect the [due process] rights of a client undergoing custodial interrogation.' Fare v. Michael C., 442 U.S. 707, 719,99 S.Ct. 2560, 61 L.Ed.2d 197, reh. denied, 444 U.S. 887, 100 S.Ct. 186,62 L.Ed.2d 121 (1979).
In the absence of a subsequent waiver, an accused who invokes his right to counsel in accordance with Miranda warnings may not CT Page 5887 be further interrogated until he has been able to secure the advice of an attorney. State v. Ferrell, supra, 44 n. 10; State v.Acquin, 187 Conn. 647, 667, 448 A.2d 163 (1982), cert. denied,463 U.S. 1229, 103 S.Ct. 3570, 77 L.Ed.2d 1411 (1983). A necessary predicate to the injunction against further interrogation is that the defendant did indeed invoke his right to counsel. If the defendant's request is equivocal, [it seemed to be that under our law] it [was] the OBLIGATION of the police to clarify the defendant's request. State v. Acquin, supra, 667-68." (Footnotes omitted; emphasis supplied.) State v. Barrett,205 Conn. 437, 447-48 (1987). However, that "obligation" indeed now seems illusory, "when a suspect makes an ambiguous or equivocal statement, it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney. . . . Clarifying questions help protect the rights of the suspect by ensuring that he gets an attorney if he wants one, and will minimize the chance of a confession being suppressed due to subsequent judicial second-guessing as to the meaning of the suspect's statement regarding counsel. But we decline to adopt a rule requiring officers to ask clarifying questions." Davis v. United States, 512 U.S. 452, 469,114 S.Ct. 2350, 129 L.Ed.2d 362 (1994).
"In Miranda, the court held that when an accused person indicates in any manner at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning, and the police must stop the interrogation. . . . The court has since narrowed this aspect of the Miranda decision by emphasizing that the right to the presence of counsel during custodial interrogation is a prophylactic rule, rather than a per se constitutional requirement; Connecticut v. Barrett,479 U.S. 523, 528, 107 S.Ct. 828, 93 L.Ed.2d 920 (1987); and by holding that an accused's request for counsel under Miranda must be objectively unequivocal. . . . It has clarified the range of protection available to a defendant who has been deemed to have properly requested the presence of counsel. See Smith v.Illinois, 469 U.S. 91, 94-95, 105 S.Ct. 490, 83 L.Ed.2d 488
(1984); Edwards v. Arizona, 451 U.S. 477, 482, 101 S.Ct. 1880,68 L.Ed.2d 378 (1981). . . . [I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning. . . . The court in Davis thus ruled that an accused's request for counsel be objectively clear and unambiguous . . . a suspect must CT Page 5888 articulate the desire for counsel sufficiently clearly that a reasonable police officer . . . would understand the statement to be a request for an attorney. . . . [T]his is an objective inquiry. . . ." (Citations omitted; internal quotation marks omitted.) State v. Anonymous, 240 Conn. 708, 720-23 (1997).
The critical problem with Pinder's question "[w]hat about a public defender?"[5] is that the verbiage used is in the nature of an inquiry rather than an unequivocal invocation of his right to counsel. The examiner responded, and responded correctly, in terms of the explanation of the legal process of appointing public defenders. No evidence, much less credible evidence, contradicts this. There is no confusion in Pinder's voice or facial expression during this segment of the interview. There is no subsequent mention of counsel at this time, and it appears that he was satisfied with the response to his inquiry. Our courts have acknowledged "that circumstances may exist where a fleeting reference to an attorney, considered in context, does not amount to an invocation." State v. Wilson, 199 Conn. 417, 443
(1986).[6] The court here would mention that there was no evidence whatsoever offered by or on behalf of the accused to suggest any contrary state of mind in terms of a request or demand for counsel. It is not suggested that Pinder had any such obligation but, nevertheless, he could not be harmed, disadvantaged or incriminated had he so testified. See Simmons v.United States, 390 U.S. 377 (1968).
The court's finding with respect to an inquiry regarding public defenders rather than being an unequivocal invocation of his right to counsel draws strong support from his subsequent clear, unequivocal invocation of that right after being advised of his Miranda rights a second time in a now CUSTODIAL situation in the same deliberate clearly, intelligible fashion by the investigating officers before attempting to take a written statement. (Emphasis supplied.) The court is again convinced that this advisory was certainly as effective and legally correct as the initial one. There was an unmistakable waiver of his Miranda
rights, subsequently overcome by his statement: "[y]eah, but I want a lawyer." This language is clear and unmistakable. Any interrogation after that claim (repeated at least twice) is inadmissible and, therefore, the written confession taken by the investigating officers thereafter must be, and is, suppressed. Any statements uttered prior to that time are found to be admissible and do not fall before the motion to suppress. CT Page 5889
An order may enter accordingly.
Moraghan, J.