Lorne J. ACQUIN, Petitioner,

v.

John R. MANSON, Commissioner, Connecticut Department of Correction, Respondent.

Civ. A. No. N–83–382 (RCZ).

United States District Court, D. Connecticut.

Sept. 5, 1986.

John R. Williams, Williams and Wise, New Haven, Conn., for petitioner.

Walter H. Scanlon, Chief Asst. State's Atty., Catherine J. Capuano, Deputy Asst. State's Atty., Waterbury, Conn., for respondent.

## MEMORANDUM OF DECISION

ZAMPANO, Senior District Judge.

The petitioner, Lorne J. Acquin, seeks habeas relief on the ground that his convictions for the brutal, mass murders of a young mother, Cheryl Beaudoin, and eight small children violated certain of his constitutional rights. 28 U.S.C. §§ 2241 and 2254.

### I.

In the early morning of July 22, 1977, police and fire officials discovered nine murdered bodies in the burned-out home of Fred and Cheryl Beaudoin in Prospect, Connecticut. Eight children, ages 4 to 12, had been viciously beaten to death with a lug wrench, and Mrs. Beaudoin had been fatally stabbed.

The police learned that Acquin, Mr. Beaudoin's foster brother, had been a visitor at the house and was the last person to have seen the victims alive. State police troopers requested Acquin's assistance in their investigation and, at approximately 9:30 A.M. that morning, Acquin voluntarily submitted to an interview with Trooper James Blais. The interview was tape recorded and included a reading of the *Miranda* rights. Subsequently, Detective Joseph Zdanowicz, after again advising Acquin of the *Miranda* rights, continued the questioning and prepared a written statement, which Acquin refused to sign. Neither the oral statements nor the written statement implicated Acquin in the murders. At about 1:30 P.M., Acquin asked to go home and Trooper George Hamila escorted him to a police car and they drove toward Waterbury where Acquin lived.

As the pair traveled to Waterbury, Lieutenant James Shea at headquarters learned of Acquin's departure and, based on additional police information of Acquin's possible involvement in the murders, radioed an order to Hamila to bring Acquin to the State Police Barracks. Acquin protested and started to leave the moving vehicle. Hamila stopped the car, and Acquin proceeded to walk toward Waterbury. Soon thereafter, he was taken into custody and brought to police headquarters at approximately 2:00 P.M. Following another reading of the *Miranda* warnings, Acquin proceeded to give non-incriminatory oral statements.

During the course of the interview, at approximately 5:45 P.M., Acquin abruptly stopped the discussion with Hamila and stated: "I think I'm in trouble, I think I better get a lawyer." Hamila asked: "Do you want a lawyer?", to which Acquin replied: "I think I better get a lawyer, I think I got trouble." Hamila immediately stopped questioning Acquin, and reported Acquin's request for an attorney to Captain Thomas McDonnell who had assumed command of the investigation.

McDonnell attempted to obtain the name of the attorney Acquin wished to represent him.[1] When Acquin stated he "didn't know," McDonnell first suggested "the attorney you had last time," to which Acquin replied that "he didn't want him" because "he didn't trust him." Acquin was also

---

1. McDonnell's testimony in relevant part concerning Acquin's request for an attorney is as

given the opportunity to pick any lawyer of his choice, but he refused to name one because "there wasn't another attorney that he wanted or trusted." McDonnell then volunteered to call "a public defender," but Acquin declined the invitation, commenting that "it would be just like talking to another cop." Finally, McDonnell offered to call in Acquin's brother, who was in the building, so that the brother could obtain an attorney for him. This was rejected by Acquin who remarked that he "didn't want his brother to get involved."

After further discussion with McDonnell concerning the services of an attorney who would be acceptable to him, Acquin indi-

cated that "it wasn't really an attorney that he wanted, it was just somebody he could trust." Acquin mentioned Dr. Joel Albert, a psychiatrist he knew from his incarceration in the New Haven Jail. McDonnell alerted Acquin that "Dr. Albert couldn't play the part of an attorney if, in fact, he wasn't an attorney." Acquin responded "he wasn't concerned about that, what he wanted was somebody to sit in that he could trust and be with him." Acquin reiterated his trust in Dr. Albert and indicated to McDonnell that "as soon as Dr. Albert got there that he would tell us the truth about what happened the night before."

follows:

Q. What, if anything, did you say to Acquin?
A. I told him that: Trooper Hamila told me that you want an attorney.
Q. What did he say?
A. He said: yes, he did.
Q. And, then what did you say?
A. I asked him who he wanted. And, there were very long pauses before he would respond to my questions. And, then he said he didn't know; asked him: did he have anyone in particular in mind. He said no. I asked him: how about the attorney that you had last time. And, he told me that he didn't trust that attorney and he didn't want him. I asked him—told him that: was there anybody else, another attorney. He said no, there wasn't another attorney that he wanted or trusted. I asked—Then I told him: if he couldn't pick an attorney that I would make calls and get a public defender or the state would provide an attorney for him. And, he replied to that that he didn't want the attorney that we—that I would call. He said: it would be just like talking to another cop. He didn't want any attorney that we choose. I then asked him about his family. I told him: I was pretty sure that his brother was in the building someplace, although I hadn't seen his brother, could his brother get an attorney for him.
Q. What did he say?
A. He said no. He didn't want his brother to get involved. He didn't want his brother to even know he was in the building or he didn't want his brother to know that he was involved here in the building with us.
Q. Then what happened?
A. Then we continued to talk about how would we find him an attorney, how would we get an attorney for him. And, he said that he—it wasn't really an attorney that he wanted, it was just somebody that he could trust. He wanted to sit and have somebody sitting with us that he trusted before he had any further conversation. And, I asked him who that, you know—is there such a person, who can we get

for you. And, he suggested a Dr. Albert, who I was not familiar with and didn't know who he was. And, I asked who he was and how he knew him. And, he told me that he knew him from the New Haven Jail and he thought he was employed at the New Haven jail.

About that time I went out to Lieutenant Shay and I told Lieutenant Shay that he wanted a Dr. Albert and to get a hold of Dr. Albert and have him come to the command center where we were.
Q. Did you ask Acquin whether or not Dr. Albert was a lawyer?
A. Yes, I did. And, he said that he knew he was a—I think he was referring to him by a slang expression. He was calling him either a shrink or a head doctor or something like that, but wasn't sure whether or not he was an attorney. And, I told him that, you know, that Dr. Albert couldn't play the part of an attorney if, in fact, he wasn't an attorney. And, Acquin just kept saying that he wasn't really concerned about that, what he wanted was somebody to sit in that he could trust and be with him.
Q. Did he say he trusted Dr. Albert?
A. He said he trusted a Dr. Albert very, very much. In fact, he said that, while this conversation was going on, that he had told me and Dr. Albert some things that we were the only two he had ever told, he hadn't even told some of his family members.
Q. And, how long did this conversation go on?
A. Well, from the time I went in the room until I came out and told Shay—I would say from a half to three quarters of an hour or so. . . .
Q. After he said he wanted to see Dr. Albert, what happened?
A. Well, that is when I told Shay to make arrangements to find Dr. Albert. And, I did that as soon as Acquin said: that as soon as Dr. Albert got there that he would tell us the truth about what happened the night before."

McDonnell ended the conversation at that point and immediately ordered Shay to find and to summon Dr. Albert to State Police Headquarters. McDonnell, Hamila and Acquin then drove to a nearby restaurant to eat. Acquin neither was handcuffed nor under any type of physical restraint during this trip.

Upon his return to headquarters, Acquin was not subject to any interrogation. He rested and slept for about two and one-half hours, until Dr. Albert's arrival at 11:40 P.M. when McDonnell woke Acquin and confirmed that he still wanted to see Dr. Albert. Before allowing Acquin to talk to Dr. Albert, McDonnell explained to Acquin that he had ascertained that Dr. Albert "was not an attorney", that "he couldn't act in the capacity of an attorney," and that any statement made in McDonnell's presence could be used against him in court.[2]

Acquin and Dr. Albert then met in private. When Acquin indicated that he wanted Dr. Albert to be a witness to his conversations with the police, Dr. Albert called McDonnell to the room. McDonnell again informed Acquin of his legal rights, and specifically mentioned that counsel could also be present if Acquin desired. At this point, Acquin orally confessed to the killings.[3]

Before a detailed written confession was taken, Acquin was again read his *Miranda*

2. McDonnell testified as follows:

"A. I first went down, told Lorne Acquin that Dr. Albert was here and did he still want to see him and that he still wanted to talk with us while Dr. Albert was present. And, he said: yes, he did. So, I went back to the room and got Dr. Albert. And, Dr. Albert came into the room. And, the three of us then sat in the room.

Q. And, what happened then?

A. Again, I attempted to make it very clear to Lorne that Dr. Albert was not an attorney. I had already inquired of that fact, that Dr. Albert—found out he was not an attorney and that he couldn't act in the capacity of an attorney. And, I told him that anything that he told Dr. Albert while I was seated there and listening and anything that I overheard, that I would be able to testify against him and use any information obtained during that conversation against him in court."

3. Dr. Albert testified as follows:

"Q. Could you describe Lorne Acquin when you first observed him this night, Doctor?

A. Mr. Acquin came in. He seemed to be waking up. He came over to me and greeted me and I greeted him. He seemed collected. He seemed to be glad to see me.

Q. What, if anything, did he say to you?

A. I believe we exchanged greetings. I think he said, 'Hi, Doc.' I said, 'Hi, Lorne.' Something of that nature.

Q. What, if anything, did he say?

A. What's that?

Q. Then what, if anything, did he say?

A. At one point or other I remember quite well he, in the presence of myself and Captain McDonnell, he said, 'Well, Doc, I really did it this time.' And I had no understanding of what that meant at that time.

Q. After this greeting and this comment, was there a period you were alone with Acquin?

A. Yes. I told the Captain that I wanted to see Mr. Acquin alone, and he left the room.

Q. He left the room?

A. Yes.

Q. And both of you were left in the room alone together?

A. That's correct.

Q. What was the conversation you had with him?

A. I asked Mr. Acquin whether he wanted me to be present, in fact, with him, and he said he did.

Q. Could you tell us, Doctor, if he said no, what would you have done?

A. I would have left.

Q. As he said yes—

A. I probably would have also asked him what was going on, things of that nature.

Q. But you would not have remained?

A. No, not at all.

Q. After this short conversation what happened?

A. Then I—once I was assured Mr. Acquin did want me to be there as a witness, I called the Captain in.

Q. What, if anything, did you say to the Captain?

A. I didn't say anything to the Captain.

Q. What happened next? Did anybody say anything?

A. At that point the Captain said something to the effect that 'Dr. Albert is here now and you said you wanted to say something else to us, or make a statement,' something of that nature, at which point Mr. Acquin went into a rather graphic confession of the killings.

Q. Do you recall how this began?

A. Spontaneously on Mr. Acquin's part.

Q. Do you recall the first thing he said in regards to—

A. As a matter of fact, I think that—I'm quite sure but I'm not absolutely sure that Captain

rights. After the statement was typed, Acquin signed it and initialed each page. In the first paragraph of the written confession, Acquin acknowledged that his statement was voluntary and that he had been fully advised of and understood his constitutional rights.

The record further discloses that in 1979 Acquin was 29 years old, had completed one year of high school, had been arrested numerous times, and was familiar with his rights under the *Miranda* ruling prior to July 22, 1977.

On September 7, 1977, Acquin was indicted on nine counts of murder and charged by an information with arson. Prior to trial, and after a lengthy evidentiary hearing, the state court denied Acquin's motion to suppress his confession. Following a five-month jury trial, he was found guilty on all charges and sentenced to a prison term of not less than 105 years nor more than life. On appeal, the Supreme Court of Connecticut rejected his constitutional challenges and affirmed the convictions. *State v. Acquin,* 187 Conn. 647, 649, 448 A.2d 163 (1982). The Supreme Court of the United States denied his writ of certiorari on July 6, 1983. 463 U.S. 1229, 103 S.Ct. 3570, 77 L.Ed.2d 1411 (1983). These habeas proceedings followed.

## II.

Acquin first attacks the ruling by the Supreme Court of Connecticut that he was not "in custody" at the 9:30 A.M. interview with police officers on July 22, 1977. The claimed constitutional importance of this finding arises from the following circumstances.

McDonnell reminded Mr. Acquin of his legal rights prior to Mr. Acquin making any—you know, going into any statement or details of what had gone on that previous evening.
Q. Do you recall the words used by Captain McDonnell?
A. No, I can't recall that.
Q. Did he say he didn't have to say anything or words to that effect?
A. Yes.
Q. All right. Do you recall the first thing that Lorne Acquin said in regards to the killings?

As previously stated, Acquin accompanied officers to state police headquarters at about 9:30 A.M. on July 22. He was read the *Miranda* rights for the first time at about 10:30 A.M., and officers began to question him about the Beaudoin family and his own activities on the previous day. The interview was tape recorded.

The Supreme Court of Connecticut sets forth in relevant part the contents of the interview among Acquin, Officer James Blais and Officer Joseph Zdanowicz, 187 Conn. at 652, n. 3, 448 A.2d 163, and characterized the circumstances surrounding the reading of the *Miranda* rights as "particularly upsetting." The court noted that, after Blais read the *Miranda* rights to Acquin, Blais stated: "We're just interviewing you. See I won't be talking to anybody...." The court then made the following critical observations:

> The statement that a police interviewer "won't be talking to anybody" is in direct contradiction to the statement in *Miranda* that "anything said can and will be used against the individual in court." *Miranda v. Arizona,* 384 U.S. 436, 469, 86 S.Ct. 1602, [1625] 16 L.Ed.2d 694 (1966). Because we hold below that the defendant was not in custody during the 9:30 a.m. interview, we need not decide what the legal effect of this elaboration on *Miranda* may be, but we cannot condone any attempt by officers to explain away the import of the fundamental constitutional rights contained in the *Miranda* warnings.

*Acquin,* 187 Conn. at 654, 448 A.2d 163.

Acquin challenges the court's ruling that, although there was a serious "contra-

A. I might just add that he also—I'm quite sure that he made it clear that it was possible if Mr. Acquin wanted to have counsel present.
Q. I see. This was before he gave the confession?
A. That's correct.
Q. What happened after he said that?
A. Then Mr. Acquin went into his statement.
Q. I see. Do you recall—this is an oral statement?
A. It was a spontaneous oral statement."

diction" by Blais in the presentation of the *Miranda* warnings, the misstatement was not of constitutional dimension because Acquin was not in custody during the 9:30 A.M. interview. He contends he was in custody and, therefore, the "contradiction" of the *Miranda* warnings by Blais was a violation of his constitutional rights, requiring habeas redress.

Before deciding the legal question of custody as presented by the parties, this Court decided to review for itself whether *in fact* there was a "contradiction" in the warnings given by Blais. With the permission of counsel for the state and the petitioner, the Court obtained the original tape of the interview from the state police. As a result of the procedures detailed in a prior memorandum of this Court entitled "Notice To Counsel," filed on November 22, 1985, the Court has concluded that the state court transcript of the conversation between Blais and Acquin (which was accepted by the state trial court, the Supreme Court of Connecticut, and the parties in these proceedings as accurate) actually contained very crucial errors. One error that the Court deems of extreme significance concerns the alleged "contradiction" of the *Miranda* warnings by Blais. The state court's official transcript recites that Blais stated, "I won't be talking to anybody...." In fact, Blais made no such statement. The tape reveals that Acquin asked why he was being advised of his rights, to which Blais responded: "See, whenever we talk to anybody like this, we have to advise you of your rights." Another critical omission in the state court transcript, but clearly audible on the tape recording, was a statement by Blais expressly informing Acquin that he was not under arrest.

Under these circumstances, this Court finds no factual support for Acquin's legal contention that Blais' alleged "contradiction" during the *Miranda* rights colloquy merits consideration in these habeas proceedings.

■ In any event, even assuming the accuracy of the state court transcript, it is clear that Acquin was not subjected to custodial questioning on the morning of July 22. Acquin voluntarily accompanied police officers to state police headquarters, expressed an intent to cooperate with the investigation, was informed he was not under arrest, and, when he requested to leave, the officers immediately terminated the interview and proceeded to drive him home. The Court agrees with the determination by the Connecticut Supreme Court that Acquin was not in custody until Shay and other troopers arrived on the scene at 2:00 P.M., at which time Acquin submitted to a show of police authority for his return to the state police command post. *Id.* at 656, 448 A.2d 163; *see also United States v. Mendenhall*, 446 U.S. 544, 553, 100 S.Ct. 1870, 1876–77, 64 L.Ed.2d 497 (1980) (a person is "seized" within the meaning of the Fourth Amendment "only when, by means of physical force or a show of authority, his freedom of movement is restrained").

### III.

■ Acquin next argues that his confession was improperly admitted into evidence because it was obtained in violation of his Fifth Amendment right to have counsel present at the interrogation.[4] Relying primarily on the principles established in *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), he argues that, having unequivocally invoked his right to counsel, he could not be subject to further interrogation by McDonnell until an attorney was present. *See also Rhode Island v. Innis*, 446 U.S. 291, 298–99, 100 S.Ct. 1682, 1688–89, 64 L.Ed.2d 297 (1980) ("[i]f the individual states that he wants an attorney, the interrogation must cease until an attorney is present"); *Fare v. Michael C.*, 442

---

4. The respondent argues that the voluntariness of Acquin's confession is a "factual issue" within the meaning of 28 U.S.C. § 2254(d), which provides that a state court's findings of fact, with certain exceptions, "shall be presumed to be correct." The argument is rejected; the voluntariness of a confession is a legal question meriting independent analysis in a federal habeas proceeding. *Miller v. Fenton*, — U.S. —, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985).

U.S. 707, 719, 99 S.Ct. 2560, 2568–69, 61 L.Ed.2d 197 (1979) (*Miranda* created a "rigid rule that an accused's request for an attorney is *per se* an invocation of his Fifth Amendment rights, requiring that all interrogation cease").

In effect, Acquin contends that *Edwards* establishes a *per se* rule that, once an accused requests the presence of an attorney, all questions *of any kind* by police are constitutionally proscribed. The Court disagrees. While emphasizing that an accused's right to counsel must be zealously guarded, *Edwards*, 451 U.S. at 482, 101 S.Ct. at 1883–84 *Edwards* also expressly recognizes that within narrow limits the accused may validly waive his right to counsel, even after an unequivocal invocation of that right. As stated by the Supreme Court in *Edwards:*

> [W]e hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, such as [the defendant], having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with police.

*Id.* at 484–485, 101 S.Ct. at 1884–85. Thus, it seems clear that the rule set forth in *Edwards* was intended to ensure that any interrogation subsequent to the expression of a desire for counsel must be initiated by the accused, and not by police authorities. *See also Wyrick v. Fields*, 459 U.S. 42, 46, 103 S.Ct. 394, 395–96, 74 L.Ed.2d 214 (1986) (*per curiam*) (before a person in custody can be subjected to further interrogation after he requests a lawyer there must be a showing that the person himself initiates dialogue with the authorities).

■ Because Acquin asked for an attorney prior to his confession, *Edwards* and its progeny requires a two-step analysis on the issue of waiver. *See, e.g., Oregon v. Bradshaw*, 462 U.S. 1039, 1044–45, 103 S.Ct. 2830, 2834–35, 77 L.Ed.2d 405 (plurality opinion of Rehnquist, J.); *id.* at 1048, 103 S.Ct. at 2836 (Powell, J., concurring in the judgment); *id.* at 1054 n. 2, 103 S.Ct. at 2839–40 n. 2 (Marshall, J., dissenting). First, the Court must determine whether the questions by McDonnell relating to Acquin's choice of an attorney constituted "interrogation," defined as "any words or action ... that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980).

In the opinion of the Court, it is clear that McDonnell's inquiries were legitimate, natural, and inevitable questions addressed to Acquin for the sole purpose of obtaining the information necessary to enable the police authorities to comply with Acquin's request for an attorney. No one of the questions was of an investigative nature within the meaning of *Edwards*, nor can they be construed to "have caused him to forget the rights of which he had been advised and which he had understood moments before." *Wyrick*, 459 U.S. at 49, 103 S.Ct. at 397. Logic and reason mandate that an police officer be permitted to ascertain the name of the attorney the suspect wishes to represent him. As the Supreme Court of Connecticut points out, "[t]he right to counsel is of little use to an accused if police are not allowed to ascertain whom to summon." *Acquin*, 187 Conn. at 670, 448 A.2d 163.

It is equally apparent that Acquin, voluntarily and without any suggestion or prodding from McDonnell, decided to reopen the dialogue with police concerning the murders when he stated that "it wasn't really an attorney he wanted, it was just somebody he could trust," and that upon the arrival of that person (Dr. Albert), "he would tell us the truth about what happened the night before." *Id.* at 662 n. 7, 448 A.2d 163.

Facially these statements might appear to be an irreconcilable reversal of his prior request for counsel made just moments before. However, on close comparison with his earlier remarks concerning the lack of trustworthiness of particular attorneys and attorneys in general, they also reveal a logical progression in Acquin's thought processes with respect to the person he really wanted by his side "before he had any further conversation" with the police. Throughout the discussions regarding the selection of an attorney, Acquin displayed a distrust of the legal profession, from his own personal lawyer ("he didn't trust that attorney"), to a "public defender" ("it would be like talking to another cop"), to *all* attorneys ("there wasn't another attorney he wanted or trusted"). Thus, while concededly Acquin initially asked for an "attorney," it seems clear that the routine, standard questioning engaged in by McDonnell following the request enabled Acquin to articulate his true desire, which was to have "somebody he could trust" with him when "he would tell us the truth about what happened the night before." He identified Dr. Albert as the person he trusted "very, very much," and the person he actually wanted McDonnell to call. After Acquin clarified his real intent, McDonnell promptly complied with Acquin's request, fulfilling, not violating, Acquin's legal rights.

Having determined that Acquin, and not the police, initiated the renewed discussions concerning the murders, the Court must now proceed to consider the second prong of the *Edwards* test: whether Acquin's waiver of his right to counsel "was knowing and intelligent and found to be so under the totality of the circumstances." *Edwards*, 451 U.S. at 486, n. 9, 101 S.Ct. at 1885–86, n. 9. *See Fare*, 442 U.S. at 725, 99 S.Ct. at 2572; *North Carolina v. Butler*, 441 U.S. 369, 374–75, 99 S.Ct. 1755, 1758, 60 L.Ed.2d 286 (1979).

After careful scrutiny of the record, the Court is convinced that Acquin knowingly and voluntarily waived his Fifth Amendment right to counsel, and that his confession was properly admitted into evidence at his state trial, for the following reasons:

1. During the course of the day on July 22, Acquin had been advised of the *Miranda* rights at least five times;

2. Acquin was reminded of his legal rights by McDonnell immediately prior to his confession;

3. Even prior to July 22, Acquin was familiar with his constitutional rights, having been arrested on numerous occasions and having had legal representation during prior criminal proceedings;

4. He attended high school, was literate, and had the capacity to understand and to appreciate his rights;

5. The conduct of police officers in all their contacts with Acquin on July 22 was circumspect and free of any possibility of threats, coercion, imposition, or unfair suggestion;

6. At the time he gave his confession, Acquin had by his side Dr. Albert, the person he trusted and had requested to be present;

7. Dr. Albert, a psychiatrist who observed Acquin prior to and during his confession, testified that Acquin was "collected," gave a "spontaneous" and "graphic" narrative, and had a psychological need to confess;

8. Acquin read, initiated and signed the written confession, after acknowledging in writing that he was fully aware of his constitutional rights; and

9. The "totality of circumstances" indicates Acquin's confession was the product of a free and deliberate choice.

## IV.

For the foregoing reasons, the petition for habeas corpus is denied.