## STATE OF CONNECTICUT *v.* ROGER GRAHAM

SPEZIALE, C. J., HEALEY, PARSKEY, ARMENTANO and SHEA, Js.

Argued January 13—decision released March 9, 1982

The appellee filed a motion for reargument which was denied.

*Richard T. Meehan, Jr.,* for the appellant (defendant).

*Jonathan C. Benedict,* assistant state's attorney, with whom, on the brief, was *Donald A. Browne,* state's attorney, for the appellee (state).

PARSKEY, J. In a two count information the defendant was charged with possession of cocaine and marijuana with intent to sell in violation of General Statutes § 19-480 (a) and 19-480 (b), respectively. After a trial to the jury, the defendant was convicted of both counts and sentenced to a term of four to ten years on the first count and to a concurrent sentence of one year on the second count. The defendant has appealed from both convictions.

The jury could have found the following facts: On June 21, 1979, members of the Statewide Narcotics Task Force and the Norwalk police department executed a warrant directing the search of the person of the defendant and premises known as 23 Keeler Avenue, Norwalk. The actual execution of the warrant commenced at about 7 p.m. with a search-team surveillance from the intersection of Keeler Avenue with the 150 to 200 foot long driveway that led to the designated premises. The surveillance was terminated when the defendant exited the house and drove a blue pickup truck to a point between the end of and ten feet into the driveway, at which point the defendant was ordered to stop and exit the vehicle. He was then arrested, advised

of his constitutional rights, patted down for weapons and searched pursuant to the warrant. At this point the defendant displayed no signs of being under the influence of either drugs or alcohol. Upon being asked if he understood his rights, the defendant responded "Yes."

While the defendant was being attended to by other officers, Patrolman Ronald Thompson, having earlier been informed that the defendant carried a gun and was the type to use one, searched under the driver's seat for a gun but found nothing.

The defendant was next handcuffed and placed in the rear seat of a patrol vehicle operated by Officer Salvatore Chappa of the Norwalk police department. Chappa, who knew the defendant from junior high school days, remained with the defendant for a minute or so, went into the house for five to ten minutes and then returned to Graham with whom he remained in the vehicle for forty-five minutes before proceeding back to police headquarters. After having been back in the car for ten to fifteen minutes, Chappa overheard Graham being given his so-called *Miranda* warnings. Thereafter Chappa made an overture to the defendant about cooperating by giving the name of his supplier. The defendant's response was to the effect that he didn't want to talk; as far as giving information where Chappa could help him; or "about it"; or about "this affair."

Thereafter, during the remainder of their stay in the driveway at 23 Keeler Avenue, the defendant and Chappa engaged in a continuing general conversation in which the defendant spoke as much as Chappa. The conversation covered such varied topics as the defendant's occupation as a carpenter and Chappa's former job in construction and their

children sharing the same birthdates. During the course of this conversation Chappa offered to do what he could to help Graham. Finally, Chappa made a statement to the effect "Roger, it's too bad that this had to happen. It's a shame. You have a beautiful wife and a beautiful child." The defendant's response was that he was thinking of giving up selling the "stuff" and changing his lifestyle. At no time did the defendant request the services of an attorney.

When the defendant was stopped at the Keeler Avenue end of the driveway, his truck was in a position blocking any further vehicular access to the house which was located about 200 feet back. The driveway being too narrow for a turn-around, Trooper Anthony Dalessio backed the truck up to the house to a point where it no longer interfered with the search. He then removed the keys from the ignition and proceeded to the house, keeping the keys in the hope of avoiding the necessity of a forced entry, it being unknown to him that entry had already been made. After entering the house Dalessio eventually arrived at the den where a locked metal box had been located. To avoid damaging the box, the key ring from the truck was examined and a key was found that unlocked the box. Inside the box was approximately one half of the cocaine that was introduced into evidence at the trial. The key, box and contents were seized as evidence.

In his appeal the defendant assigns error in the trial court's admitting into evidence his oral statement to Chappa, the key to the strong box and hearsay testimony pertaining to the defendant's character. Although the resolution of the first

assignment is dispositive of this appeal, because the other issues are likely to arise on a new trial, we shall also discuss the remaining assignments.

## I

Before addressing the issue of custodial interrogation it behooves us to clear away the underlying brushwood. Whatever the positions taken at the trial, the defendant concedes that the incriminating statement attributed to him by Chappa was made in the patrol car at the search scene and that at that time he had not requested an attorney. The state concedes that the statement was made while the defendant was in custody and after he had been given the so-called *Miranda* warnings. The dispute concerns the character of the ensuing conversation between the defendant and Chappa. The defendant claims that what took place constituted a custodial interrogation in violation of the defendant's fifth and fourteenth amendment rights as spelled out in *Miranda* v. *Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). On the other hand the state asserts that what occurred was a conversation between old acquaintances and that the incriminating statement which ultimately eventuated was unanticipated and fortuitous. We disagree. The state does not claim that the defendant either explicitly or implicitly waived his *Miranda* rights. See *State* v. *Wilson,* 183 Conn. 280, 286, 439 A.2d 330 (1981). We shall, therefore, limit our present discussion to the interrogation issue. Furthermore, because it is undisputed that *Miranda* warnings were given in this case, our focus is further limited to the post warning interchange. Although the state attempts to characterize the defendant's response to Chappa's overture for information as

ambiguous and as an expression of an unwillingness merely to talk about the source of his drug supply, a fair reading of the response would lead any detached observer to the reasonable conclusion that the defendant had invoked his constitutional right to remain silent.

*Miranda* has established the prophylactic procedural safeguards which are to accompany the giving of the prescribed warnings: "Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been invoked." *Miranda* v. *Arizona*, supra, 473–74.

The claimed interrogation took place at the search scene while Graham was seated in Chappa's patrol car. Before Chappa started talking to Graham, another police officer had attempted to question him but Graham indicated that he didn't want to talk. Chappa revealed to his superiors in the house being searched that he knew Graham from school days and either Chappa's superiors or Chappa himself suggested that he should try to get Graham to cooperate. Chappa then went out to the car and spoke with Graham for forty-five minutes, according to Chappa and an hour and a half to two hours, according to Graham. At the outset of the conversation Chappa tried to talk Graham into cooperating with the

agents, offering to try to help him out if he did, but Graham responded that he didn't want to talk about it. Chappa, in substance, told Graham, "Look, tell me something and I'll go back in there and see if I can help you out with these guys." After Graham declined to talk, Chappa continued the inquiry although he couldn't recall asking Graham any further questions about narcotics or drugs during the conversation. The conversation also covered such topics as family and occupations of mutual interest. Finally Chappa remarked, "Roger, it's too bad that this had to happen. It's a shame. You have a beautiful wife and a beautiful child." Graham responded that he was thinking of giving up selling the "stuff" and changing his lifestyle.

Certain conclusions may be drawn from the recitation of the Chappa inquiry. Not only was Graham's right to cut off questioning not scrupulously honored, it was not honored at all. *Miranda* inhibits not only police encounters of the third degree kind, it also precludes all types of questioning and psychological ploys, calculated or reasonably likely to produce the desired result. Interrogation extends to any words or actions on the part of police officers that they should know are reasonably likely to elicit an incriminating response. *Rhode Island* v. *Innis,* 446 U.S. 291, 301–302, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980). If we apply that test, the Chappa inquiry amounted to constitutionally impermissible interrogation.

## II

The key to the strong box was properly admitted under the plain view doctrine. A plain view seizure is authorized if (1) the police intrusion that leads up to the view is legal, (2) the discovery of the

evidence is inadvertent and (3) the police have probable cause to believe there is a reasonable relation between the evidence seized and the criminal behavior under investigation. *Coolidge* v. *New Hampshire,* 403 U.S. 443, 446, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971); *State* v. *Federici,* 179 Conn. 46, 56, 425 A.2d 916 (1979); *State* v. *Pepe,* 176 Conn. 75, 79–80, 405 A.2d 51 (1978). The location of the truck at the end of the driveway not only obstructed the police in the execution of the search warrant but also provided any occupant of the premises to be searched with a convenient get-away vehicle. In these circumstances it was not unreasonable for the police to move the truck closer to the house where it could be kept under close observation, if necessary, and where it could also be rendered immobile.

In the execution of a search warrant it is sometimes reasonably necessary for the police to take certain precautionary measures. It is for this reason, among others, that the details of how best to proceed with a search authorized by warrant are generally left to the discretion of the police officers subject to the general fourth amendment protection against unreasonable searches and seizures. *Dalia* v. *United States,* 441 U.S. 238, 257, 99 S. Ct. 1682, 60 L. Ed. 2d 177 (1979).

Once having entered the truck, the police had a right to remove the ignition key and the key ring to which it was attached. That there were other keys on this ring was purely a fortuitous circumstance. Taking all of the keys attached to the ring was a justified caretaking procedure. See *South Dakota* v. *Opperman,* 428 U.S. 364, 369–71, 96 S. Ct. 3092, 49 L. Ed. 2d 1000 (1976); *Mozzetti* v. *Superior Court of Sacramento County,* 4 Cal. 3d 699, 700–701, 484

P.2d 84 (1971).[1] When the police, in the course of their search of the house, located the strong box,[2] an examination of the key ring would not only have revealed the key which would likely open the box but, more importantly, the key at that point would become a valuable piece of evidence linking its possessor to the contents of the box. *Payton* v. *New York,* 445 U.S. 573, 587, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980). When probable cause arose that the key was reasonably related to the strong box, the key was transformed from being held under the caretaking function to being seized within the meaning of the fourth amendment. That the key was inadvertently being held because of a prior valid police intrusion brings the circumstances within the plain view doctrine, even though probable cause was not simultaneous with the inadvertent discovery.

## III

Officer Ronald Thompson testified that after the defendant was removed from the truck he searched it but found nothing. On cross-examination he was asked why it was necessary to search the cab of the truck since the defendant was already in custody and under the supervision of armed police officers.[3]

---

[1] "These procedures developed in response to three distinct needs: the protection of the owner's property while it remains in police custody, the protection of the police against claims or disputes over lost or stolen property, and the protection of the police from potential danger." (Citations omitted.) *South Dakota* v. *Opperman,* 428 U.S. 364, 369, 96 S. Ct. 3092, 49 L. Ed. 2d 1000 (1976).

[2] The defendant presents no claim of error concerning the seizure of the strong box itself.

[3] The officer was cross-examined in pertinent part as follows:

"Q. Now, you got to the defendant in the truck that he was driving, you went over there. Were you one of the first officers there?

"A. Yes, I was.

"Q. And did you actually take the defendant out of the truck?

On redirect, the state's attorney established that Thompson was searching for a gun. When he then asked the officer, "Why was that?" Thompson, over objection, was permitted to respond, "We were told

"A. No, I don't believe so.

"Q. All right. Did you tell the defendant he was under arrest?

"A. No, I didn't.

"Q. Were you present when some police officer there told him he was under arrest?

"A. Yes, I was.

"Q. And did you see him taken out of the truck or did you see him get out of the truck?

"A. Yes, I did.

"Q. And when he got out of the truck, did you search his person at all, yourself?

"A. No, I didn't.

"Q. Did you see another policeman there search his person?

"A. Yes, I believe so. . . .

"Q. And when he got out of the truck, was he placed against the truck, that you could see?

"A. I don't recall. I immediately went in the truck.

"Q. You immediately went into the truck?

"A. Yes.

"Q. And did you start to search the truck?

"A. Yes, I did.

"Q. Now, at the time you went into the truck, the defendant was no longer in the truck, was he?

"A. No, he wasn't.

"Q. And could you tell us where the defendant was in relation to the truck when you went into the truck?

"A. In the very immediate area.

"Q. All right. Give us an estimate, if you can.

"A. Two feet.

"Q. Pardon?

"A. Two feet.

"Q. Two feet away from the truck and, I take it, at that time there were people around him; is that correct?

"A. Yes.

"Q. And, I take it, at that time he had no chance of escaping?

"A. I wouldn't think so, no.

"Q. All right. And it had been established that he had no weapon on his person; right?

"A. At this point, no, it hadn't been established.

"Q. All right. But in any event, he was, at least, two feet away from the truck?

that he carries a gun and he would use it, he was the type to use it and, as I said, I just reached under the seat at the exact spot where he was sitting. I didn't tear the truck apart, or go into the glove compartment or anything."

"A. Yes.

"Q. And can you tell us approximately how many policemen were around him at that time?

"A. Approximately six.

"Q. Six? And so you then went into the truck; is that correct?

"A. Yes.

"Q. All right. And you went into the truck for the purpose of searching it; isn't that so?

"A. Yes.

"Q. And when you went into the truck to search it, you were aware, were you not, that there was no search warrant to search that truck?

"A. Yes, I was.

"Q. And tell us what you seized from the truck.

"A. Nothing. . . .

"Q. Okay. Now, how did you search the truck?

"A. I only reached under the front seat.

"Q. All right. Did you look in the glove compartment?

"A. No.

"Q. Did you look under the dashboard?

"A. No.

"Q. And did you take the seat out at all?

"A. No.

"Q. Okay. Now, did any other officer come and search the truck while you were searching the truck?

"A. While I was searching the truck, no.

"Q. Okay. How long did you remain with the truck, then?

"A. Ten, 15 seconds.

"Q. So, you were only in the truck about 10 or 15 seconds?

"A. Right.

"Q. And then from there you come, what, went up to the house?

"A. Yes.

"Q. So, you don't know what happened back at the truck after that?

"A. No. I don't.

"Q. But when you went up to the house, was the defendant hand-cuffed at that time?

"A. I don't know.

"Q. But he was still surrounded by these six or seven policemen? Would you agree?

The basic purpose of redirect examination is to enable a witness to explain and clarify relevant matters in his testimony which have been weakened or obscured by his cross-examination. *State* v. *Reed,* 174 Conn. 287, 301, 386 A.2d 243 (1978); *Grievance Committee* v. *Dacey,* 154 Conn. 129, 151, 222 A.2d 339 (1966); McCormick, Evidence (2d Ed.) § 32. On cross-examination the defendant pursued a line of inquiry suggesting that in searching the truck the officer acted without authority or justification. While the reason for the officer's action would not have been a proper subject of inquiry on direct examination, the extent to which such inquiry could be pursued on redirect was a matter within the

"A. Yes, I'd agree to that.

"Q. Would you agree he was pretty well taken in tow?

"A. Yes. . . .

"Q. Now, before you went out to make your observations, over there on Keeler Avenue, did you have sort of an orientation with some other policemen like the State policemen and the Norwalk policemen?

"A. Yes, we did.

"Q. And was it made known to you that there was a search and seizure warrant in existence for 23 Keeler Avenue?

"A. Yes.

"Q. And as a policeman, you'd want to know that before you intruded into someone's home; isn't that so?

"A. Yes.

"Q. And as a policeman, you wouldn't go into someone's home without a search warrant unless certain circumstances warranted it, like, chasing after a felon trying to escape.

"A. Yes, that's correct.

"Q. And that's part of your training, too; right?

"A. Yes.

"Q. And was it made known to you that on this search warrant, there was a command from a judge to search the house and person of the defendant, Roger Graham?

"A. Yes.

"Q. And was it also made known to you that the judge never commanded you or any officer serving that search warrant to search that truck?

"A. Yes, I was aware of that.

"Q. But nevertheless you went in and searched it anyway?

"A. Yes."

court's discretion. *State* v. *Reed,* supra. The court might well have excluded any reference to the defendant's character traits, but because the thrust of the cross-examination was to impugn the officer's motives, it cannot be said that the court abused its discretion in permitting the witness to reveal the complete informational basis upon which he acted.

There is error, the judgment is set aside and a new trial is ordered.

In this opinion the other judges concurred.