STATE OF CONNECTICUT *v.* JOHN ROY
(12281)

LAVERY, LANDAU and HEIMAN, Js.

Argued March 22—decision released June 21, 1994

*Daniel S. Blinn,* special public defender, for the appellant (defendant).

*Nancy L. Gillespie,* deputy assistant state's attorney, with whom, on the brief, were *John T. Redway,* state's attorney, and *Timothy Liston,* assistant state's attorney, for the appellee (state).

HEIMAN, J. The defendant appeals from the judgment of conviction, rendered after a jury trial, of burglary in the third degree in violation of General Statutes § 53a-103,[1] as a lesser included offense of burglary in the first degree; General Statutes § 53a-101 (a) (1); larceny in the first degree in violation of General Stat-

---

[1] General Statutes § 53a-103 (a) provides: "A person is guilty of burglary in the third degree when he enters or remains unlawfully in a building with intent to commit a crime therein."

utes § 53a-122 (a),[2] stealing a firearm in violation of General Statutes § 53a-212[3] and conspiracy to commit each of the crimes with which he was charged in violation of General Statutes § 53a-48.[4] On appeal, the defendant asserts that the trial court improperly (1) refused to suppress testimony concerning statements made by him to the police in violation of his *Miranda*[5] rights, (2) denied his motion for judgment of acquittal, and (3) convicted him of both larceny and stealing a firearm. We affirm the judgment of the trial court.

The jury could reasonably have found the following facts. On the evening of July 13 and the early morning of July 14, 1991, the defendant and Donald Young were riding in Young's truck while contemplating breaking into a gun store in Bristol. The defendant was armed with a nine millimeter pistol and Young carried a .38 caliber revolver. They looked through the windows of a Bristol gun store and noted that no weap-

[2] General Statutes § 53a-122 provides in pertinent part: "(a) A person is guilty of larceny in the first degree when he commits larceny as defined in section 53a-119 and . . . (2) the value of the property or service exceeds ten thousand dollars . . . ."

General Statutes § 53a-119 provides in pertinent part: "A person commits larceny when, with intent to deprive another of his property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. . . ."

[3] General Statutes § 53a-212 (a) provides: "A person is guilty of stealing a firearm when, with intent to deprive another of his firearm or to appropriate the same to himself or a third party, he wrongfully takes, obtains or withholds a firearm, as defined in subdivision (19) of section 53a-3."

General Statutes § 53a-3 (19) provides: " 'Firearm' means any sawed-off shotgun, machine gun, rifle, shotgun, pistol, revolver or other weapon, whether loaded or unloaded from which a shot may be discharged . . . ."

[4] General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

[5] *Miranda* v. *Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

ons were visible. As a result, they decided to find another store from which to steal guns.

Both the defendant and Young had earlier observed Teddy's Gun Shop in Haddam (Teddy's) and had concluded that it was possible to break into that gun store because of its poor security. They thus decided, instead of breaking into the Bristol store, to break into Teddy's. At the time that they made this decision, Young was operating his truck on Route 72 in Bristol.

Teddy's is located in a densely wooded area with sparse population. In the immediate vicinity of the store are an apartment complex, a house and a restaurant. Teddy's is located on the second floor, over the Glockenspiel restaurant. Young parked his truck in the restaurant parking lot and he and the defendant walked to the area of the gun shop. At that time, the Glockenspiel restaurant had been closed for about one hour.

The defendant turned off the power to the building. When the power was shut off, the defendant and Young climbed a ladder that they had placed on the west side of the building. They went to a window that was equipped with an alarm pressure switch and the defendant kicked the switch to bend it so that it would not pop up and activate the alarm. They broke the window, pushed up the window latch and the defendant entered the premises. Young waited outside observing the area in case a silent alarm had been activated.

Young followed the defendant into Teddy's through the window and they proceeded to load guns into gun cases. The defendant and Young remained in Teddy's for about three hours. Before placing the guns in the cases, the defendant sprayed the guns with a very light oil to prevent rusting. In addition, they placed a .44 magnum, two .45 caliber, two nine millimeter and two .380 caliber guns in a small duffle bag for removal. The defendant and Young also took ammunition, holsters,

magazines, several aimpoint laser scopes and a silencer. Young also removed about $100 from the cash register, which he later divided with the defendant.

The boxes containing the stolen property were placed in Young's truck and transported to the Cenacle property in Middletown. The property is the site of an abandoned convent with wooded trails and several buildings in various states of disrepair. The defendant and Young took the boxes that contained some of the items removed from Teddy's and stored them in an underground concrete structure that the defendant referred to as the "Witch Cabin." The structure had a heavy steel door over the top. The defendant took the stainless steel nine millimeter Baretta and the .380 caliber Baretta, and Young took the .22 caliber Baretta and the .38 caliber Smith and Wesson. They stored the remaining weapons and paraphernalia in the underground structure, covered the steel door with dirt and leaves, and left the area.

On July 16, 1991, Young and Ronald Pollack visited the underground structure and Young showed Pollack the weapons and other items that had been taken from Teddy's. While they were at the structure, they shot one of the nine millimeter weapons. Young removed several of the weapons including a nine millimeter Luger with a silencer attached, a .45 caliber, a .22 caliber, a .380 caliber and another nine millimeter weapon. Young also attempted to file serial numbers from several of the weapons. Young and Pollack then traveled to East Hartford. Pollack was operating a vehicle with Young as the passenger. The vehicle was stopped by the East Hartford police and both Young and Pollack were arrested. When the police stopped the vehicle, Young placed the weapons that he had removed from the cache onto the floor of the vehicle. The East Hartford police took the weapons into possession, identi-

fied them as having been taken in the burglary at Teddy's and notified the state police.

On July 17, 1991, Young was interviewed by two Connecticut state police officers. During that discussion, Young told the police officers about the burglary. Pollock also spoke with the state police and directed the police to the underground structure where the weapons had been concealed by the defendant and Young. On July 17, 1991, the defendant was arrested pursuant to a warrant.

I

The defendant first asserts that the trial court improperly admitted into evidence a statement made by him while he was in custody because (1) he unequivocally invoked his *Miranda* rights or (2) the trial court failed to make proper inquiry regarding the defendant's intent when he crossed out his signature on the waiver form. We are unpersuaded.

Certain additional facts are necessary for a resolution of this issue. Sergeant Gregory Snead of the Middletown police had taken the defendant into custody in Middletown and had advised him that the state police had a warrant for his arrest. Snead advised the defendant as to his *Miranda* rights and discussed with the defendant an unrelated case involving the Middletown police. At no time did the defendant request that Snead stop questioning him nor did he request the presence of an attorney. The defendant was responsive and cooperative with Snead.

After being taken into custody by the Middletown police, the defendant was subsequently transported to Troop F in Westbrook by Detectives Marsha Youngquist and Patrick Gaffney of the Connecticut state police. Upon arrival at Troop F, the defendant was fingerprinted, photographed and his *Miranda* rights were

read to him. After being advised of his rights, the defendant placed his initials after each of the statements in a waiver of rights form.[6] Following his reading and initialing of the form, the defendant signed the form on the signature line, crossed out the signature and then reaffixed his signature adjacent to the signature that he had crossed out. Before the defendant resigned the form, Youngquist reread to the defendant the last paragraph of the waiver form. The defendant then again signed the form.

The defendant testified in his own behalf in the hearing on his motion to suppress the statements that he had made to Youngquist. He asserted that he had advised Youngquist that he did not want to say anything until he had his attorney present. He stated that he had told her that several times, but she continued questioning him. He also asserted that he crossed out his initial signature on the waiver of rights form[7] because it said that he was willing to answer questions and make a statement when he was unwilling to do so,

---

[6] The form that the defendant initialed was as follows:

"WAIVER

|  | Initials |
| --- | --- |
| I have been advised that: | |
| I have the right to remain silent. | JR |
| If I talk to any police officer, anything I say can and will be used against me in court. | JR |
| I have the right to consult with a lawyer before I answer any questions and I may have a lawyer with me during questioning. | JR |
| I have the right to have a lawyer appointed for me, if I cannot afford one, before I answer any questions. | JR |
| I know that if I answer questions, I have the right to stop answering at any time. | JR |
| I may stop answering questions at any time if I wish to talk to a lawyer, and I may have him with me during any further questioning. | JR |
| I am willing to answer questions and make a statement knowing that I have these rights. I do not want a lawyer. I know and understand what I am doing. I do this freely and voluntarily and no threats or promises have been made to me. | JR" |

[7] See footnote 6.

and that he had advised Youngquist of this fact by saying that he would have nothing to say without his attorney. He also claimed that he finally signed the waiver because Youngquist told him that it was just standard procedure to sign the waiver of rights and that it made no difference since he had already been arrested for the crime. He further testified that Youngquist continued questioning him after he had asserted his desire to speak with counsel. He also admitted that Youngquist told him that he did not have to talk simply because he signed the waiver form. The defendant testified as to his prior encounters with the criminal justice system, admitting that he had been given his *Miranda* warnings on a number of occasions and had given both oral and written statements to the police following his numerous other arrests.

The state police detectives talked with the defendant for about one and one-half hours. The defendant was generally talkative although evasive when he was pressed for details concerning the break-in at Teddy's, by attempting to change the subject and discussing other crimes that he had committed with Young. When Youngquist told the defendant that they knew that he had broken into Teddy's, he nodded his head, said "Yeah," and then volunteered that they "got a lot of guns." The defendant asked if he could make a phone call at the completion of the interview and was permitted to do so. He elected to call his girlfriend.

On the morning of July 18, 1991, Youngquist brought the defendant a statement that she had prepared after the interview concerning one of the other incidents that they had discussed. She again read the defendant his *Miranda* rights and waiver. The defendant declined to sign the statement saying that his lawyer had told him not to sign anything.

On the basis of the evidence before it, the trial court found credible the testimony of the police officers, but

not that of the defendant. The trial court found that the defendant had been properly advised of his *Miranda* rights, that he understood those rights, and that he voluntarily waived those rights when he spoke with the police on a number of topics, including his admissions with respect to the burglary at Teddy's. The trial court, on the basis of credibility, further found that the defendant had failed to invoke his right to counsel, with either Youngquist or Snead, and that he had not invoked his right to remain silent. The trial court specifically found the testimony of Snead and Youngquist more credible than that of the defendant. The trial court denied the defendant's motion to suppress the admissions made to the police.

## A

The defendant first asserts that the trial court incorrectly found that he had waived his *Miranda* rights. We are unpersuaded.

"The state has the burden of proving by a preponderance of the evidence that the defendant knowingly and intelligently waived his *Miranda* rights, including his right to remain silent." *State* v. *Barrett,* 205 Conn. 437, 449, 534 A.2d 219, rev'd on other grounds, 479 U.S. 523, 107 S. Ct. 828, 93 L. Ed. 2d 920 (1987); *State* v. *Grant,* 33 Conn. App. 647, 660, 637 A.2d 1116 (1994); *State* v. *Irving,* 27 Conn. App. 279, 283, 606 A.2d 17, cert. denied, 222 Conn. 907, 608 A.2d 694 (1992). We have defined the term "valid waiver" in accordance with the test established by the United States Supreme Court in *Johnson* v. *Zerbst,* 304 U.S. 458, 464, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938), "as the intentional relinquishment or abandonment of a known right. . . . Although mere silence of the accused is not enough to establish waiver . . . the record need not show a specific expression of relinquishment of rights. . . . Instead, a waiver may be inferred from the actions and

words of the person interrogated . . . and from his course of conduct." (Citations omitted; internal quotation marks omitted.) *State* v. *Barrett,* supra, 450; *State* v. *Madera,* 210 Conn. 22, 48, 554 A.2d 263 (1989); *State* v. *Irving,* supra, 283. The issue of whether the defendant has voluntarily, knowingly and intelligently waived his rights is not subject to an exact test but is an issue to be determined from the facts in the case. *State* v. *Fisher,* 210 Conn. 619, 625, 556 A.2d 596 (1989); *State* v. *Toste,* 198 Conn. 573, 580–81, 504 A.2d 1036 (1986).

"Although the issue is . . . ultimately factual, our usual deference to factfinding by the trial court is qualified, on questions of this nature, by the necessity for a scrupulous examination of the record to ascertain whether such a factual finding is supported by substantial evidence." (Citations omitted; internal quotation marks omitted.) *State* v. *Madera,* supra, 210 Conn. 48–49; *State* v. *Clark,* 24 Conn. App. 115, 122, 585 A.2d 1266, cert. denied, 218 Conn. 903, 588 A.2d 1078 (1991); see *State* v. *Medina,* 228 Conn. 281, 294, 636 A.2d 351 (1994); *State* v. *Rosado,* 218 Conn. 239, 255, 588 A.2d 1066 (1991). When we consider the validity of the claimed waiver, we look, as did the trial court, to the totality of the circumstances surrounding the waiver. *State* v. *Madera,* supra, 49; *State* v. *Rollins,* 20 Conn. App. 27, 33, 564 A.2d 318, cert. denied, 213 Conn. 803, 567 A.2d 833 (1989).

We have set out the factual predicate found by the trial court in making its determination that there was a valid *Miranda* waiver by the defendant. Its finding was based on its determination of the credibility of the witnesses heard during the hearing on the motion to suppress.

A scrupulous examination of the record reveals that the trial court's fact-finding on this issue is supported by substantial evidence. It thus applied the law cor-

rectly in finding that there was a knowing, intelligent and voluntary waiver by the defendant of his *Miranda* rights.

## B

As a second string to his bow, the defendant asserts that the trial court improperly failed to conduct a proper inquiry because the defendant signed the waiver of rights form, then crossed out his signature and re-signed the form next to his original signature. The defendant posits that the action of the defendant in crossing out his signature was equivocal and the police were required to seek clarification as to why he crossed out his initial signature, even though he re-signed the waiver form before proceeding with any interrogation. We do not agree.

The trial court made an affirmative finding that at no time did the defendant invoke either his right to counsel or his right to remain silent. We have already concluded that the trial court's determination of this issue was supported by substantial evidence. *State* v. *Madera,* supra, 210 Conn. 48–49.

The defendant contends that his act of crossing out his signature constituted an action that at least required clarification by the police before further questioning. See *State* v. *Acquin,* 187 Conn. 647, 674–75, 448 A.2d 163 (1982), cert. denied, 463 U.S. 1229, 103 S. Ct. 3570, 77 L. Ed. 2d 1411 (1983). The defendant's reliance on *Acquin* is, however, misplaced. In *Acquin,* the defendant, upon being advised of his *Miranda* rights stated, "I think I better get a lawyer." Id., 672. Further discussion, however, indicated that the request was not as unequivocal as it first appeared, but that it required additional development since it later appeared that the defendant wanted a person that he trusted to be with him during questioning, not necessarily a lawyer. Id., 672. Once even an equivocal request is made for the

presence of counsel by a suspect during custodial interrogation, the scope of that interrogation is then immediately narrowed to the clarification of that request until it is clear what the suspect desires. *Thompson* v. *Wainwright,* 601 F.2d 768, 771 (5th Cir. 1979); *State* v. *Acquin,* supra, 674; see *State* v. *Anderson,* 209 Conn. 622, 628, 553 A.2d 589 (1989).

The record is clear, however, that here no further interrogation took place once the defendant crossed out his signature until after he voluntarily, and without prodding or request by the police, re-signed the waiver form. The record discloses that the only statement made by the police after the defendant had crossed out his signature was a reading of the last paragraph of the waiver form. The defendant thereupon re-signed the form. Thus, by the time the police began to question the defendant, he had unequivocally acted to waive his rights. The trial court had before it the testimony of Youngquist concerning the sequence of events that transpired. The trial court found that the testimony of Youngquist was credible on this issue and that the testimony of the defendant was not. "The question of the credibility of witnesses is for the trier to determine. . . . Where testimony is conflicting the trier may choose to believe one version over the other . . . as the probative force of the evidence is for the trier to determine." (Citations omitted.) *State* v. *Madera,* supra, 210 Conn 37.[8] We conclude that, while the act of crossing out the signature was an event that would ordinarily have required clarification, here the need for clarification was obviated by the fact that no interrogation took place until after the defendant unequivocally had knowingly, voluntarily and intelligently waived his *Miranda* rights.

[8] We also note our discussion in part I A, wherein we upheld the finding by the trial court that the defendant had effectively waived his *Miranda* rights before any questioning took place.

## C

The defendant, however, further posits that an additional factor supports his theory that he acted equivocally. He points to his evasiveness upon interrogation as evidence that he had invoked his right to remain silent. We are not persuaded.

We first note that this claim differs from, although in argument it was coupled with, his claim relating to the crossing out of his signature as evidence of an equivocal act requiring exploration by the authorities.[9] We have already concluded that the defendant unequivocally waived his rights by signing the second time and we now conclude that his alleged evasiveness does not support a claim of even an equivocal action invoking his right to silence.

We first note that the defendant relies on *State* v. *Graham,* 186 Conn. 437, 441 A.2d 857 (1982), to support the proposition that the act of evading questions relating to the crime would lead a detached observer to conclude that the defendant had invoked his constitutional right to remain silent. His reliance on *Graham,* however, is misplaced. In *Graham,* the defendant had already indicated to a police officer that he did not want to talk with him. Id. In addition, the officer to whom Graham made incriminating statements was an individual who knew Graham from their school days and either he or his superiors suggested that he attempt to secure Graham's cooperation. Id. At the outset of the conversation between Graham and the second officer, Graham reiterated that he did not want to talk about the occurrence. Despite the second invocation of his right to silence, the officer continued to make inquiry. Id., 443.

---

[9] See part I B of this opinion.

Here, the defendant never invoked his right to silence and, in addition, after he failed to answer questions about the crime under investigation, he brought up other crimes in which he and Young had been involved, either separately or together.

Our Supreme Court has held that even a direct declination to answer a specific question does not constitute an invocation of the right to remain silent, unless accompanied by words or action indicating that the person does not want to answer any questions at all. *State* v. *Jones,* 193 Conn. 70, 83, 475 A.2d 1087 (1984).

The record contains substantial evidence to support the finding by the trial court that the defendant knowingly, voluntarily and intelligently waived his right to remain silent.

The defendant asserts that the actions of the police violated both his state and federal constitutional rights. The claim is based on the defendant's assertion, with which we disagree, that his actions constituted at least an equivocal invocation of his rights. The defendant has failed to provide us with a separate analysis of his claim under the Connecticut constitution and we therefore choose not to review this claim. *State* v. *Francis,* 228 Conn. 118, 122 n.3, 635 A.2d 762 (1993); *State* v. *Walker,* 33 Conn. App. 763, 766, 638 A.2d 1084, cert. denied, 229 Conn. 913, 642 A.2d 1209 (1994); *State* v. *Andrews,* 33 Conn. App. 590, 592 n.3, 637 A.2d 787 (1994). The defendant's claim that the trial court improperly admitted evidence of his custodial statements is without merit.

## II

The defendant next claims that the evidence offered was insufficient to support his conviction. In this instance, the defendant is not entitled to review of this issue.

Certain additional facts are necessary for a proper resolution of this claim. The record reflects that at the completion of the presentation of evidence by the state, the defendant moved for a judgment of acquittal pursuant to Practice Book § 884.[10] The trial court denied the motion. The defendant then proceeded to offer evidence in his own behalf, albeit on a very limited basis. At the completion of all of the evidence, the defendant failed to move for judgment of acquittal pursuant to Practice Book § 885,[11] nor did the defendant move for a judgment of acquittal after the verdict of guilty pursuant to Practice Book § 899.[12]

Under the present rules, when a defendant elects to put on any evidence after a denial of his motion for judgment of acquittal at the end of the state's evidence, he is deemed to have waived his right to appellate review as to the sufficiency of the evidence at the end of the state's case. *State* v. *Battista,* 31 Conn. App. 497, 502, 626 A.2d 769, cert. denied, 227 Conn. 907, 632 A.2d 696 (1993); *State* v. *Wolff,* 29 Conn. App. 524, 527, 616 A.2d 1143 (1992); *State* v. *Booker,* 28 Conn. App.

---

[10] Practice Book § 884 provides: "If the motion is made after the close of the prosecution's case in chief, the judicial authority shall either grant or deny the motion before calling upon the defendant to present his case in chief. If the motion is not granted, the defendant may offer evidence without having reserved the right to do so."

[11] Practice Book § 885 provides: "If the motion is made at the close of all the evidence in a jury case, the judicial authority may reserve decision on the motion, submit the case to the jury, and decide the motion either before the jury return a verdict or after they return a verdict of guilty or after they are discharged without having returned a verdict."

[12] Practice Book § 899 provides: "If the jury return a verdict of guilty, the judicial authority, upon motion of the defendant or upon his own motion, shall order the entry of a judgment of acquittal as to any offense specified in the verdict, or any lesser included offense, for which the evidence does not reasonably permit a finding of guilty beyond a reasonable doubt. If the judicial authority directs an acquittal for the offense specified in the verdict, but not for a lesser included offense, he may either:

"(1) Modify the verdict accordingly; or

"(2) Grant the defendant a new trial as to the lesser included offense."

34, 41–42, 611 A.2d 878, cert. denied, 223 Conn. 919, 614 A.2d 826 (1992); *State* v. *Kari*, 26 Conn. App. 286, 291, 600 A.2d 1374 (1991), appeal dismissed, 222 Conn. 539, 608 A.2d 92 (1992).[13] Thus, the defendant's claim with respect to the sufficiency of the evidence at the completion of the state's case is not reviewable. *State* v. *Wolff*, supra, 528; *State* v. *Booker*, supra, 41.

Because the defendant failed to move for judgment of acquittal after all of the evidence had been presented; Practice Book § 885; or after the rendition of the guilty verdict; Practice Book § 899; he failed to preserve properly the claim concerning the sufficiency of all of the evidence. See *State* v. *Harvey*, 27 Conn. App. 171, 186, 605 A.2d 563, cert. denied, 222 Conn. 907, 608 A.2d 693 (1992).

## III

Finally, the defendant asserts that his conviction of both larceny in the first degree in violation of General Statutes § 53a-122 and theft of a firearm in violation of General Statutes § 53a-212 violated his rights under the fifth amendment to the United States constitution[14]

---

[13] We previously recognized in *State* v. *Booker*, supra, 28 Conn. App. 42 n.8, and in *State* v. *Wolff*, supra, 29 Conn. App. 527 n.5, that our Supreme Court has acknowledged the criticism of the waiver rule and its possible implications concerning the constitutional rights of a criminal defendant. See, e.g., *State* v. *Simino*, 200 Conn. 113, 118 n.5, 509 A.2d 1039 (1986); *State* v. *Lizzi*, 199 Conn. 462, 464–65, 508 A.2d 16 (1986); *State* v. *Rutan*, 194 Conn. 438, 444, 479 A.2d 1209 (1984); *State* v. *Duhan*, 194 Conn. 347, 352, 481 A.2d 48 (1984). Our Supreme Court has continued to apply the waiver rule and has not abrogated, changed or abolished the rule and its application. See *State* v. *Medina*, supra, 228 Conn. 302 n.28. Accordingly, because the waiver rule represents the existing law on this subject in our state, we apply it in this case.

[14] The fifth amendment to the United States constitution provides in pertinent part: "No person shall be held to answer for a capital, or otherwise infamous crime, unless on presentment or indictment of a Grand Jury . . . nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb . . . ."

and under article first, § 9,[15] of the constitution of Connecticut. We are unpersuaded.[16] We also note that although asserting a violation of article first, § 9, of the Connecticut constitution, which has been held to encompass protection against double jeopardy; *State* v. *Boyd,* 221 Conn. 685, 690, 607 A.2d 376, cert. denied, U.S.    , 113 S. Ct. 344, 121 L. Ed. 2d 259 (1992); *State* v. *Lonergan,* 213 Conn. 74, 78–79, 566 A.2d 677 (1989), cert. denied, 496 U.S. 905, 110 S. Ct. 2586, 110 L. Ed. 2d 267 (1990); *Kohlfuss* v. *Warden,* 149 Conn. 692, 695, 183 A.2d 626, cert. denied, 371 U.S. 928, 83 S. Ct. 298, 9 L. Ed. 2d 235 (1962); the defendant has failed to provide a separate analysis of his state constitutional claim, and we choose not to afford review of the state claim. *State* v. *Walker,* supra, 33 Conn. App. 766; *State* v. *Andrews,* supra, 33 Conn. App. 592 n.3.

We thus turn to the defendant's claim made under the fifth amendment to the United States constitution. " 'The double jeopardy clause of the fifth amendment to the United States constitution provides: "[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb." The double jeopardy clause is applicable to the states through the due process clause of the fourteenth amendment. *Benton* v. *Maryland,* 395 U.S. 784, 794, 89 S. Ct. 2056, 23 L. Ed. 2d 707 (1969); *State* v. *Lonergan,* [supra, 213 Conn. 78]. This constitutional guarantee prohibits not only multiple trials for the same offense, but also multiple punishments for the same offense in a single trial.

[15] The constitution of Connecticut, article first, § 9, provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law."

[16] While the defendant's claims are set forth as three separate subissues under a general claim that the "[t]rial court erred in convicting Mr. Roy of both larceny in the first degree and theft of firearms," the first two assertions of these claims, relating to legislative intent, are subsumed by the third assertion that his conviction violated the double jeopardy provisions of both the state and federal constitutions.

*Brown* v. *Ohio,* 432 U.S. 161, 165, 97 S. Ct. 2221, 53 L. Ed. 2d 187 (1977); *State* v. *Anderson,* 212 Conn. 31, 35, 561 A.2d 897 (1989); *State* v. *John,* 210 Conn. 652, 693, 557 A.2d 93, cert. denied, 493 U.S. 824, 110 S. Ct. 84, 107 L. Ed. 2d 50 (1989).' *State* v. *Greco,* 216 Conn. 282, 289–90, 579 A.2d 84 (1990)." *State* v. *Woodson,* 227 Conn. 1, 7, 629 A.2d 386 (1993); *State* v. *Nita,* 27 Conn. App. 103, 113, 604 A.2d 1322, cert. denied, 222 Conn. 903, 606 A.2d 1329, cert. denied, U.S. , 113 S. Ct. 133, 121 L. Ed. 2d 86 (1992); *State* v. *Fernandez,* 27 Conn. App. 73, 94–95, 604 A.2d 1308, cert. denied, 222 Conn. 904, 606 A.2d 1330 (1992).

Although not raised by the defendant, we must first determine whether the crimes arose out of the same transaction. "Double jeopardy analysis in the context of a single trial is a two-step process. First the charges must arise out of the same act or transaction. Second, it must be determined whether the charged crimes are the same offense. Multiple punishments are forbidden only if both conditions are met." (Internal quotation marks omitted.) *State* v. *DePastino,* 228 Conn. 552, 571–72, 638 A.2d 578 (1994); *State* v. *Snook,* 210 Conn. 244, 264, 555 A.2d 390, cert. denied, 492 U.S. 924, 109 S. Ct. 3258, 106 L. Ed. 2d 603 (1989); *State* v. *Palmer,* 206 Conn. 40, 52, 536 A.2d 936 (1988); *State* v. *Grant,* supra, 33 Conn App. 652. In determining whether the crimes arose out of the same act or transaction, we refer to the language of the information. *State* v. *Raymond,* 30 Conn. App. 606, 611, 621 A.2d 755 (1993); *State* v. *Nita,* supra, 27 Conn. App. 113.

The information leaves little question that both offenses arose out of the same transaction. The third substituted or amended information charges the defendant with larceny in the first degree in violation of General Statutes § 53a-122 (a) (2) and alleges that the crime occurred in Haddam on July 14, 1991, and that the defendant, together with David Young, stole

firearms, ammunition, gun cases, rifle scopes, a knife and moneys of a value in excess of $10,000 from Teddy's. The information further charges the defendant with stealing a firearm in violation of General Statutes § 53a-212 (a) at the same time and place and with the same coconspirator as the charge of larceny. We conclude, on the basis of our review of the information, that the crimes charged did arise out of the same act or transaction.

Our next inquiry is whether the two offenses are the same for double jeopardy purposes. *State* v. *Nita,* supra, 27 Conn. App. 114. " 'The traditional test for determining whether two offenses are the same offense for double jeopardy purposes was set forth in *Blockburger* v. *United States,* 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932).' *State* v. *Chicano,* 216 Conn. 699, 706–707, 584 A.2d 425 (1990) [cert. denied, 501 U.S. 1254, 111 S. Ct. 2898, 115 L. Ed. 2d 1062 (1991)]. Under the *Blockburger* test, 'a defendant may be convicted of two offenses arising out of the same criminal incident if each crime contains an element not found in the other.' *State* v. *Vass,* 191 Conn. 604, 615, 469 A.2d 767 (1983); see *State* v. *Greco,* [supra, 216 Conn. 291]. We determine whether each crime contains an element not found in the other by examining only the relevant statute, the information and the bill of particulars, and not the evidence presented at trial. *State* v. *Greco,* supra [291]." *State* v. *Tweedy,* 219 Conn. 489, 495, 594 A.2d 906 (1991); *State* v. *Fernandez,* supra, 27 Conn. App. 95. "The term 'element' as used in the *Blockburger* analysis . . . means any fact that the legislature has deemed essential to the commission of the crime." *State* v. *Woodson,* supra, 227 Conn. 10.

The crimes of larceny in the first degree and stealing a firearm, as charged, each has a different focus, and each contains an element that the other does not. The focus of the larceny in the first degree statute, as

charged in this instance, is the theft of property having a value in excess of $10,000. Property, as used in the statutes relating to larceny, means "any money, personal property, real property, thing in action, evidence of debt or contract, or article of value of any kind." General Statutes § 53a-118 (a). The resolution of the issue of the guilt of a defendant charged with larceny in the first degree does not turn on the nature of the property stolen but on its value. *State* v. *Saracino,* 178 Conn. 416, 420, 423 A.2d 102 (1979). The stealing a firearm statute, however, focuses on the type of property stolen rather than the value of the property. In addition, in order to convict an individual of stealing a firearm in violation of General Statutes § 53a-212, it is incumbent on the state to prove as an element of the crime that the stolen instrumentality is a firearm. A firearm is defined as "[a]ny sawed-off shotgun, machine gun, rifle, shotgun, pistol, revolver or other weapon, whether loaded or unloaded from which a shot may be discharged." General Statutes § 53a-3 (19). Operability of the firearm is an essential element to establish a violation of § 53a-212. *State* v. *Carpenter,* 19 Conn. App. 48, 59, 562 A.2d 35, cert. denied, 213 Conn. 804, 567 A.2d 834 (1989); but see *State* v. *Adams,* 331 N.C. 317, 332, 416 S.E.2d 380 (1992), and *State* v. *Boykin,* 78 N.C. App. 572, 574, 337 S.E.2d 678 (1985). (North Carolina General Statutes § 14-72 (b) (4), theft of a firearm, and North Carolina General Statutes § 14-72, larceny, not separate offenses because firearm statute does not require operability.) Thus, each crime requires proof of an element that the other does not—with respect to the larceny charge, the total value of the property stolen, and, with respect to the stealing a firearm charge, the operability of the firearm as defined in § 53a-3 (19). "[T]he focus must be on the offenses and whether each offense requires proof of a fact that the other does not." *State* v. *Walton,* 227

Conn. 32, 53–54, 630 A.2d 990 (1993). On the basis of the existence of differing elements between the two statutes, we conclude that the charges are not the same for double jeopardy purposes.

The *Blockburger* test is a rule of statutory construction rather than a conclusive presumption. *State* v. *Fernandez,* supra, 27 Conn. App. 95. Thus, we cannot end our analysis here. "[A] presumption under *Blockburger* that there are two crimes which may warrant two punishments may be rebutted " 'by showing a clear legislative intent that the two statutes be treated as one for double jeopardy purposes.' ' " *State* v. *Russell,* 25 Conn. App. 243, 251, 594 A.2d 1000, cert. denied, 220 Conn. 911, 597 A.2d 338 (1991); see also *State* v. *Fernandez,* supra, 95. "The language, structure and legislative history of a statute can provide evidence of this intent." *State* v. *Greco,* supra, 216 Conn. 293; *State* v. *Nita,* supra, 27 Conn. App. 116.

The defendant contends that the legislative history makes it clear that the General Assembly intended that, where firearms are the property stolen, § 53a-212 applies and not the larceny statutes. The defendant further argues that, even if we conclude that the legislature did not intend that the stealing a firearm statute be the only statute applicable to the stealing of a firearm, the legislative intent was not to create a separate crime in addition to the larceny statute, but merely to ensure that the theft of a small quantity of firearms be treated as a class D felony and not as a misdemeanor. We remain unpersuaded.

Our review of the legislative history of the stealing a firearm statute leads us to conclude that nothing in that history indicates an intent on the part of the legislature not to create a separate and additional offense involving the stealing of a firearm. Nothing in the his-

tory supports the defendant's claim that the legislature did not intend to expose a person involved in the theft of a firearm to both penalties.

The comment by the commission to revise our penal code with respect to the larceny statutes reveals that "[t]he degree of larceny is, for the most part, determined by the value of the property taken or, in some cases, by the way in which it is taken. It is not generally determined by the kind of property."[17] Thus, the legislature created other statutes that recognize that the type of property involved is, in some instances, germane to the state's penological interest. Moreover, the defendant has attempted an analysis of the legislative history only of the stealing a firearm statute. Because the legislative history pertains only to the firearm statute, it "does not illuminate our legislature's intent regarding the interplay between our [larceny] statutes and the [stealing a firearm] statute." *State* v. *Fernandez,* supra, 27 Conn. App. 97. Because we discern no clear legislative intent to prohibit separate punishments for larceny in the first degree and stealing a firearm, we reject the defendant's double jeopardy claim.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[17] Commission to Revise the Criminal Statutes, General Comments, Connecticut General Statutes (1971), pp. 38–39.